**L. Claire LANDER, Charles M. Droz, Julian Block, and Zelda Block, Plaintiffs–Appellants,**

v.

**HARTFORD LIFE & ANNUITY INSURANCE COMPANY and Hartford Life Insurance Company, Defendants–Appellees.**

**Docket No. 00–7849.**

United States Court of Appeals, Second Circuit.

Argued Jan. 30, 2001.

Decided May 25, 2001.

Uitz of Uitz & Associates; Sheldon S. Lustigman and Andrew B. Lustigman of The Lustigman Firm, P.C.; James R. Newcomer of James, Hoyer, Newcomer, Forizs & Smiljanich, P.A.; and Elias A. Alexiades of Hurwitz & Sagarin, L.L.C.; on the brief), for Plaintiffs–Appellants.

Daniel McNeel Lane, Jr., Akin, Gump, Strauss, Hauer & Feld, L.L.P., San Antonio, TX (Barry A. Chasnoff and David R. Nelson of Akin, Gump, Strauss, Hauer & Feld, L.L.P.; and Donald E. Frechette of Edwards & Angell, L.L.P.; on the brief) for Defendants–Appellees.

The Securities Exchange Commission, Washington, DC (David M. Becker, General Counsel; Jacob H. Stillman, Solicitor; Mark Pennington, Assistant General Counsel; Michael A. Conley, Attorney Fellow; and Meyer Eisenberg, Deputy General Counsel; on the brief) submitted a brief as amicus curiae.[1]

Before OAKES, STRAUB, and POOLER, Circuit Judges.

STRAUB, Circuit Judge:

Plaintiffs–Appellants L. Claire Lander, Charles M. Droz, Julian Block, and Zelda Block brought a class action alleging that the Defendants Appellees Hartford Life & Annuity Insurance Company and Hartford Life Insurance Company (collectively referred to as "Hartford Life") violated Connecticut statutory and common law through fraudulent representations in the marketing of variable annuity contracts. After the case was removed to the United States District Court for the District of Connecticut (Alfred V. Covello, *Chief Judge*), the District Court denied the plaintiffs' motion to remand the case back to Connecticut Superior Court and dis-

Michael C. Spencer, Milberg Weiss Bershad Hynes & Lerach, L.L.P., New York, N.Y. (Melvyn I. Weiss, Janine L. Pollack and Lee A. Weiss of Milberg Weiss Bershad Hynes & Lerach, L.L.P.; Ronald A.

1. Although the National Association of Insurance Commissioners ("NAIC") was also invited to submit a brief as *amicus curiae,* it de-

clined to do so. Neither the SEC nor the NAIC appeared at oral argument.

missed the plaintiffs' complaint pursuant to the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"), Pub.L. No. 105–353, 112 Stat. 3227 (codified as amended in part at 15 U.S.C. §§ 77p & 78bb(f)), which states, *inter alia*, that "no covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging . . . an untrue statement or omission of a material fact in connection with the purchase or sale of a covered security. . . ." On appeal, the plaintiffs contend that these rulings were in error. This appeal thus presents two issues of first impression for this Circuit: [2]

(1) Whether Congress intended variable annuities to be a "covered security" under SLUSA, and thereby preempt class actions based on state law that allege fraud in the sale of such instruments.

(2) Whether the McCarran–Ferguson Act precludes the application of the preemptive provisions of SLUSA to variable annuities.

Because we conclude that variable annuities are "covered securities" as defined by SLUSA and that, in the circumstances presented here, the McCarran–Ferguson Act, ch. 20, 59 Stat. 33 (1945) (codified as amended at 15 U.S.C. § 1011 *et seq.*), does not alter the normal rules of preemption, the District Court properly refused to remand the case to Connecticut state court and properly dismissed the case pursuant to SLUSA's directive that all such class actions be based exclusively on federal law. Accordingly, we affirm the judgment of the District Court.

## FACTUAL BACKGROUND

The named plaintiffs sue on behalf of a class of individuals who purchased variable annuity policies from Hartford Life in connection with a tax-qualified investment plan, such as an Individual Retirement Account ("IRA") or 401(k) plan.

An annuity is a contract between a seller (usually an insurance company) and a buyer (usually an individual, also referred to as the "annuitant") whereby the annuitant purchases the right to receive a stream of periodic payments to be paid either for a fixed term or for the life of the purchaser or other designated beneficiary. For traditional or "fixed" annuities, the stream of payments begins immediately or soon after the contract is purchased. The contract will specify the amount of interest that will be credited to the annuitant's account as well as the amount of payments to be received under the contract. *See* Joan E. Boros & W. Randolph Thompson, *A Vocabulary of Variable Insurance Products,* 813 PLI/Comm 11, 15–16 (2001). Fixed annuities are typically thought of as insurance products because the annuitant receives a guaranteed stream of income for life, and the insurer assumes and spreads the "mortality risk" of the annuity—the risk that the annuitant will live longer than expected, thereby receiving benefits that exceed the amount paid to the seller of the policy. *Id.* at 20.

Variable or deferred annuities differ in that the stream of payments that the annuitant receives does not immediately commence upon purchase of the contract. Instead, the purchaser of a variable annuity will make either a single payment or series of payments to the seller, who will then invest this principal in various securities, usually mutual funds or other investments.

---

**2.** Indeed, to this Court's knowledge, no other federal appellate court has yet addressed these issues.

*See id.* The annuitant typically controls how the principal is invested, choosing from a set of portfolios according to the annuitant's investment strategy. During the accumulation phase of the annuity—from the time the policy is purchased to the time it begins to pay out—the value of the annuity will rise or fall depending on the performance of the underlying securities in which the annuitant's principal is invested. *See* SEC, Variable Annuities: What You Should Know, http://www.sec.gov/investors/pubs /varannty.htm (May 22, 2001) ("SEC, Variable Annuities"). After a defined number of years the policy will reach its maturity date and begin to pay benefits to the annuitant, known as the "payout" phase. The annuitant is not guaranteed a certain level of benefits under the policy, instead, the payment amount will vary depending upon the value of the portfolio upon maturity and the annuitant's life expectancy. *See id.*

Variable annuities are typically characterized as "hybrid products," possessing characteristics of both insurance products and investment securities. *See* Boros & Thompson, *supra*, at 28. For example, by providing periodic payments that will continue for the life of the annuitant, variable annuities provide a hedge against the possibility that an individual will outlive his or her assets after retirement, thereby making the policies similar to insurance contracts. *See* SEC, Variable Annuities. In addition, most variable annuity contracts contain a death benefit whereby the beneficiary of the policy will receive a specified amount if the annuitant dies before the payout period begins. *See id.* Finally,

like fixed annuities, the insurer assumes and pools the risk of policyholders outliving the expected term of the annuity. But at the same time, variable annuities possess characteristics akin to those of investment securities. Most notably, unlike the beneficiary of a fixed annuity, the variable annuitant bears the investment risk of the underlying securities. *See id.* Because the amount of benefits paid to the annuitant under the contract is not fixed, but will vary depending on the performance of the investment portfolio, many consumers use variable annuities as a tool for accumulating greater retirement funds through market speculation. Variable annuities must be registered with the SEC as securities under the Securities Act of 1933, *codified at* 15 U.S.C. § 77a *et seq. See SEC v. Variable Annuity Life Ins. Co.*, 359 U.S. 65, 69–73, 79 S.Ct. 618, 3 L.Ed.2d 640 (1959). While variable annuities are primarily sold by insurance companies, the policies must be offered through "separate accounts." [3] These separate accounts must be registered with the SEC as investment companies under the Investment Company Act of 1940, *codified at* 15 U.S.C. § 80a–1 *et seq. See Prudential Ins. Co. of Am. v. SEC*, 326 F.2d 383 (3d Cir.), *cert. denied*, 377 U.S. 953, 84 S.Ct. 1629, 12 L.Ed.2d 497 (1964).

Under the Internal Revenue Code, funds placed in variable annuity contracts receive preferred tax treatment, and are taxed only when the annuitant begins to draw them from the account. *See, e.g.*, 26 U.S.C. § 72. During the accumulation phase of the investment, gains derived from appreciation of the assets are not

**3.** The Investment Company Act of 1940 defines a "separate account" as "an account established and maintained by an insurance company pursuant to the laws of any State or territory of the United States or of Canada or any province thereof, under which income, gains and losses, whether or not realized, from assets allocated to such account, are, in accordance with the applicable contract, credited to or charged against such account without regard to other income, gains, or losses of the insurance company." 15 U.S.C. § 80a–2(37).

taxed. It is only during the payout phase when money is withdrawn from the policy that the income to the policyholder or beneficiary is taxed. *See* SEC, Variable Annuities. This tax treatment provides variable annuities with a valuable advantage over "straight" investment products such as mutual funds or other equities. The tax advantage of variable annuities, however, will not be realized if the funds used to purchase the policy are already tax deferred. *See id.* In other words, if funds set aside through a tax deferred investment vehicle, such as a 401(k) plan or IRA account, are used to purchase a variable annuity contract, the policyholder will receive no additional tax benefit. *See id.*

This tax redundancy forms the basis for the plaintiffs' suit. In their complaint, the plaintiffs allege that Hartford Life marketed variable annuity contracts as appropriate for use in connection with tax deferred investment vehicles, such as 401(k) or IRA plans. The plaintiffs claim that they relied upon the advice and expertise of Hartford Life representatives who misrepresented the suitability of variable annuities and failed to warn consumers of the tax redundancy that occurs when the products are purchased with already tax deferred dollars. Moreover, the plaintiffs allege that the fees associated with variable annuities exceeded those of other investments that they otherwise would have utilized. They allege that the fees assessed by variable annuities resulted in the loss of up to one-third of the value of their accounts, as compared to straight investment products such as mutual funds. Therefore, the plaintiffs allege that Hartford Life engaged in "deceptive methods" and used "materially false and deceptive" representations in marketing variable annuities, and that these misrepresentations deceived the plaintiffs into paying higher fees for tax benefits that Hartford Life knew the plaintiffs would not realize.

## PROCEDURAL HISTORY

This case was initially filed in the Connecticut Superior Court in New Britain, Connecticut. In its complaint, the plaintiffs asserted claims under the Connecticut Unfair Insurance Practices Act ("CUIPA"), Conn.Gen.Stat. § 38a–815 *et seq.*, the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn.Gen.Stat. § 42–110a *et seq.*, and Connecticut common law for fraud, fraudulent concealment, deceit, breach of fiduciary duty, negligent misrepresentation, negligence, unjust enrichment, and imposition of constructive trust.

On January 21, 2000, Hartford Life removed the case to the United States District Court for the District of Connecticut pursuant to 28 U.S.C. § 1441(b) which allows "any civil action of which the district courts have original jurisdiction founded on a claim or right arising under the ... laws of the United States" to be removed from state to federal court. Removal was also justified under the text of SLUSA, which amended § 16(c) of the Securities Act of 1933 to state that "[a]ny covered class action brought in any State court involving a covered security ... shall be removable to the Federal district court for the district in which the action is pending...." 15 U.S.C. § 77p(c).

After removal, on February 2, 2000, the plaintiffs moved to remand the action pursuant to 28 U.S.C. § 1447(c) which provides for remand back to state court when the initial removal was in error or when the district court lacks subject matter jurisdiction. The plaintiffs argued that the initial removal was in error because variable annuities are not a "covered security" as defined by SLUSA. Therefore, they argued, because only state law causes of action were asserted, the District Court lacked subject matter jurisdiction. On

June 14, 2000, the District Court rejected the plaintiffs' motion, finding that variable annuities are covered securities as defined by SLUSA. Furthermore, the court held that the suit must be dismissed pursuant to SLUSA's directive that

> [n]o covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging ... an untrue statement or omission of a material fact in connection with the purchase or sale of a covered security or ... that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security.

15 U.S.C. § 77p(b). The District Court found that the instant action is a "covered class action" that alleged misrepresentations in the sale of a "covered security." Therefore, because the plaintiffs asserted only state law causes of action, the suit had to be dismissed.

This timely appeal followed.

## DISCUSSION

■■■ On appeal, the plaintiffs argue that Congress never intended variable annuities to be within the preemptive reach of SLUSA and that, by virtue of the McCarran–Ferguson Act, SLUSA cannot be interpreted to invalidate private causes of action brought under Connecticut state law. We review conclusions of law and questions of statutory interpretation *de novo. See, e.g., United States v. Koh,* 199 F.3d 632, 636 (2d Cir.1999); *United States v. Figueroa,* 165 F.3d 111, 114 (2d Cir. 1998); *Travellers Int'l, A.G. v. Trans World Airlines, Inc.,* 41 F.3d 1570, 1575 (2d Cir.1994). Moreover, the denial of a motion to remand by a District Court is a conclusion of law and is therefore reviewed

*de novo. See Foy v. Pratt & Whitney Group,* 127 F.3d 229, 232 (2d Cir.1997).

## I. Background of SLUSA

SLUSA is one of several federal securities statutes passed in the latter half of the 1990s which were intended to promote uniformity in the securities markets. In 1995, Congress passed the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub.L. 104–67, 109 Stat. 737 (1995) (codified in part at 15 U.S.C. §§ 77z–1, 78u), to provide uniform standards for class actions and other suits alleging fraud in the securities market. PSLRA was intended to prevent "strike suits"—meritless class actions that allege fraud in the sale of securities. *See* H.R. Conf. Rep. No. 105–803 (1998). Because of the expense of defending such suits, issuers were often forced to settle, regardless of the merits of the action. *See* H.R. Conf. Rep. 104–369 (1995). PSLRA addressed these concerns by instituting, *inter alia,* heightened pleading requirements for class actions alleging fraud in the sale of national securities, *see* 15 U.S.C. § 78u–4, and a mandatory stay of discovery so that district courts could first determine the legal sufficiency of the claims in all securities class actions, *see* 15 U.S.C. § 77z–1(b). These mechanisms were intended to "enact reforms to protect investors and maintain confidence in our capital markets" by "discourag[ing] frivolous litigation." H.R. Conf. Rep. 104–369 (1995). PSLRA also has the effect, however, of discouraging non-frivolous litigation.

By 1998, however, it became clear to Congress that many of the goals of PSLRA had not been realized. According to SLUSA's Congressional findings, many class action plaintiffs avoided the stringent procedural hurdles erected by PSLRA by bringing suit in state rather than federal court. *See* Pub.L. No. 105–353 § 2(2). By suing in state court under state statutory

or common law, these litigants were able to assert many of the same causes of action, but avoid the heightened procedural requirements instituted in federal court.[4] *See id.* According to a joint House–Senate Committee Report, the decline in federal securities class action suits that occurred after the passage of PSLRA was accompanied by a nearly identical increase in state court filings. *See* H.R. Conf. Rep. No. 105–803 (1998).

SLUSA was passed in 1998 primarily to close this loophole in PSLRA. It did this by making federal court the exclusive venue for class actions alleging fraud in the sale of certain covered securities and by mandating that such class actions be governed exclusively by federal law. *See* 15 U.S.C. §§ 77p(b)-(c). SLUSA was also intended to work in concert with the National Securities Markets Improvement Act of 1996 ("NSMIA"), Pub.L. No. 104–290, 110 Stat. 3416 (1996) (codified in part at 15 U.S.C. §§ 77r, 80a). *See* H.R. Conf. Rep. No. 105–803 (1998). The primary purpose of NSMIA was to preempt state "Blue Sky" laws which required issuers to register many securities with state authorities prior to marketing in the state. By 1996, Congress recognized the redundancy and inefficiencies inherent in such a system and passed NSMIA to preclude states from requiring issuers to register or qualify certain securities with state authorities. *See* 15 U.S.C. § 77r(a). Several of SLU-SA's provisions, most notably its definition of "covered security"—the provision at issue here-are borrowed from NSMIA. *See* 15 U.S.C. § 77p(f)(3) (defining covered security according to § 18(b) of the Securities Act of 1933, 15 U.S.C. § 77r(b), which was added to that act by NSMIA, Pub.L. No. 104–290 § 102(a)).

Given this background, we now turn to the plaintiffs' argument that Congress never intended SLUSA to reach variable annuity contracts.

## II. Textual Analysis

■ When considering questions of statutory interpretation, we begin with the language of the statute. *See Koh*, 199 F.3d at 636.

In regard to removal from state to federal court, SLUSA provides: "Removal of Covered Class Actions.—Any covered class action brought in any State court involving a covered security, as set forth in subsection (b), shall be removable to the Federal district court for the district in which the action is pending . . . ." 15 U.S.C. § 77p(c). The statute further defines both "covered class action" and "covered security."

A "covered class action" is defined as "any single lawsuit in which . . . one or more named parties seek to recover damages on a representative basis on behalf of themselves and other unnamed parties similarly situated, and questions of law or

---

4. When enacting SLUSA, Congress found that (1) the Private Securities Litigation Reform Act of 1995 sought to prevent abuses in private securities fraud lawsuits; (2) since enactment of that legislation, considerable evidence has been presented to Congress that a number of securities class action lawsuits have shifted from Federal to State courts; (3) this shift has prevented that Act from fully achieving its objectives; (4) State securities regulation is of continuing importance, together with Federal regulation of securities, to protect investors and promote strong financial markets; and (5) in order to prevent certain State private securities class action lawsuits alleging fraud from being used to frustrate the objectives of the Private Securities Litigation Reform Act of 1995, it is appropriate to enact national standards for securities class action lawsuits involving nationally traded securities, while preserving the appropriate enforcement powers of State securities regulators and not changing the current treatment of individual lawsuits. Pub.L. No. 105–353 §§ 2(1)-(5).

fact common to those persons or members of the prospective class predominate over any question affecting only individual persons or members...." 15 U.S.C. § 77p(f)(2). The complaint in the instant case states that "Plaintiffs are suing in their individual capacities and on behalf of a class, defined as: All persons who purchased an individual deferred annuity ... sold by one of the defendants, which was used to fund a contributory (not defined benefit) retirement plan...." Therefore, the suit is clearly a class action in which common questions of law and fact predominate over individual questions of law or fact. In fact, in their submissions on appeal, the plaintiffs do not even contest that, if variable annuities are a "covered security," their suit qualifies as a covered class action.

■ SLUSA defines "covered security" as "a security that satisfies the standards for a covered security specified in paragraph (1) or (2) of section 77r(b) of this title, at the time during which it is alleged that the misrepresentation, omission, or manipulative or deceptive conduct occurred...." 15 U.S.C. § 77p(f)(3). Section 77r(b)(2) states that a "security is a covered security if such security is a security issued by an investment company that is registered, or that has filed a registration statement, under the Investment Company Act of 1940." 15 U.S.C. § 77r(b)(2). Two aspects of this definition warrant further discussion. First, we must determine whether a variable annuity is a "security." This question was conclusively answered by the Supreme Court in *SEC v. Variable Annuity Life Insurance Co. of America*, 359 U.S. 65, 79 S.Ct. 618, 3 L.Ed.2d 640 (1959) (*"VALIC"*). In *VALIC*, the Court considered whether variable annuities must be registered as securities under the Securities Act of 1933 and whether the sellers of such products must

register under the Investment Company Act of 1940. In deciding this question, the Court held that, although possessing some insurance characteristics, variable annuities are properly classified as securities and thus subject to the federal securities statutes. *See id.* at 70–72, 79 S.Ct. 618. Thus, in *VALIC*, the Court held that variable annuity contracts are in fact securities.

The second issue in regard to SLUSA's definition of "covered security" is whether variable annuities are sold by companies registered under the Investment Company Act of 1940. Again, *VALIC* provides much of our answer. In *VALIC*, the Supreme Court held that issuers of variable annuities must comply with the Investment Company Act of 1940. *See id.* at 70–71, 79 S.Ct. 618. Moreover, although insurance companies like Hartford Life are not themselves investment companies registered under the 1940 Act, they may sell variable annuities only through separate investment accounts that must be registered with the SEC pursuant to the 1940 Act. *Prudential Ins. Co. of Am. v. SEC*, 326 F.2d 383, 388 (3d Cir.), *cert. denied*, 377 U.S. 953, 84 S.Ct. 1629, 12 L.Ed.2d 497 (1964). Therefore, because variable annuities are securities, and because the separate accounts used for marketing these products are registered with the SEC under the Investment Company Act, the removal clause of the statute is satisfied.

■ Just as the removal clause of SLUSA is satisfied, so too is the dismissal clause. SLUSA states that

[n]o covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging ... an untrue statement or omission of a material fact in connection with the purchase or sale of a covered security; or ... that the defendant used or employed any manip-

ulative or deceptive device or contrivance in connection with the purchase or sale of a covered security.

15 U.S.C. § 77p(b). As previously described, the plaintiffs' cause of action satisfies both the definition of "covered security" and "covered class action." Moreover, the plaintiffs' claims are based solely on the statutory and common law of Connecticut and allege fraud in the sale of variable annuities. Therefore, the text of SLUSA calls for dismissal of the action.

## III. Other Evidence of Legislative Intent

■ While the plaintiffs concede that the language of the statute apparently covers variable annuities, they contend that the structure, history, and purpose of SLUSA demonstrate that Congress never intended class action litigation concerning variable annuities to be preempted by SLUSA. If a statute's text is unambiguous and clearly disposes of an issue, our inquiry ordinarily ends. *See, e.g., Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992). However, "[t]he strong presumption that the plain language of the statute expresses congressional intent" may, in limited circumstances, be rebutted "when a contrary legislative intent is clearly expressed." *Koh*, 199 F.3d at 637 (citations omitted). To prevail, therefore, the plaintiffs must provide clear evidence that Congress never intended variable annuities to be covered by SLUSA, and that should we hold otherwise, we would undermine the intent of the statute.

### A. Intended Effect of SLUSA

Contrary to the plaintiffs' claims, when we consider the intended effect of SLUSA, as articulated by the legislative findings, we find further support for the proposition that Congress intended to reach variable annuities. Among the findings enacted in SLUSA, Congress stated that "it is appropriate to enact national standards for securities class action lawsuits involving nationally traded securities. . . ." Pub.L. No. 105–353 § 2(5). The variable annuities at issue here meet that precise description. Hartford Life markets these products on a national basis, selling in all fifty states and the District of Columbia. As if to prove this point, the named plaintiffs in the instant action are residents of New York, Missouri, and Florida and sue on behalf of a nationwide class of plaintiffs.[5]

Moreover, both the statutory findings and the accompanying conference report make it clear that SLUSA targeted class action litigation intended to be reached by PSLRA, but which evaded the procedural requirements of PSLRA by migrating to state court. *See* Pub.L. No. 105–353 § 2(5); H.R. Conf. Rep. No. 105–803 (1998). The plaintiffs contend that variable annuities were not intended to be reached by SLUSA because insurance litigation has traditionally occurred in state courts. However, they fall short of making the more specific claim that class action litigation concerning variable annuities always occurred in state court. This is likely because the more specific claim is belied by the many class actions concerning annuities that were filed in federal court prior to enactment of PSLRA. *See, e.g., In re Prudential Ins. Co. of Am. Sales*

---

5. The plaintiffs argue that the absence of references to variable annuity products in the legislative history of SLUSA indicates that Congress did not intend to address these products. However, "[i]t would be a strange canon of statutory construction that would require Congress to state in committee reports or elsewhere in its deliberations that which is obvious on the face of a statute." *Koh*, 199 F.3d at 636–37 (quoting *Harrison v. PPG Indus., Inc.*, 446 U.S. 578, 592, 100 S.Ct. 1889, 64 L.Ed.2d 525 (1980)).

*Practices Litig.,* 148 F.3d 283 (3d Cir.1998) (filed 1994), *cert. denied,* 525 U.S. 1114, 119 S.Ct. 890, 142 L.Ed.2d 789 (1999); *Otto v. Variable Annuity Life Ins. Co.,* 814 F.2d 1127 (7th Cir.1986); *Duhaime v. John Hancock Mut. Life Ins. Co.,* No. Civ. A. 96–10706–GAO, 1997 WL 888989 (D.Mass. June 13, 1997); *Buoniconti v. Bankers Sec. Life Ins. Soc'y,* No. 81–C–6630, 1985 WL 1377 (N.D.Ill. May 16, 1985); *Sweeney v. Keystone Provident Life Ins. Co.,* 578 F.Supp. 31 (D.Mass. 1983); *but see Ex parte Compass Bank,* 686 So.2d 1135, 1136 (Ala.1996) (class action filed in state court in 1994). Moreover, subsequent to the enactment of PSLRA, class actions involving hybrid products such as variable annuities have frequently been filed in state court. *See, e.g., In re Lutheran Bhd. Variable Ins. Prods. Co. Sales Practices Litig.,* 105 F.Supp.2d 1037 (D.Minn.2000) (dismissing pursuant to SLUSA at least four class actions filed in state court that were removed and consolidated); *Lasley v. New Eng. Variable Life Ins. Co.,* 126 F.Supp.2d 1236 (N.D.Cal. 1999) (removed from state to federal court); *but cf. Olmsted v. Pruco Life Ins. Co. of N.J.,* 134 F.Supp.2d 508 (E.D.N.Y.2000) (class action filed in federal court alleging excessive fees charged by variable insurance policies). This pattern demonstrates that contrary to the plaintiffs' *ipse dixit* assertions, variable annuity litigation falls into the class of suits targeted by Congress in SLUSA.

### B. Statutory Context

Like the plain language of SLUSA, the larger statutory context in which SLUSA resides, including PSLRA, NSMIA, the Securities Act of 1933, the Securities Exchange Act of 1934, and the Investment Company Act of 1940, supports application of SLUSA to variable annuities.

When considered in concert, SLUSA, NSMIA, and PSLRA demonstrate that Congress intended to provide national, uniform standards for the securities markets and nationally marketed securities. Through these statutes, Congress erected uniform standards for registration of, and litigation concerning, a defined class of covered securities. *See, e.g.,* H.R. Conf. Rep. No. 105–803 (1998) ("[C]onsistent with the determination that Congress made in the National Securities Markets Improvement Act (NSMIA), [SLUSA] establishes uniform national rules for class action litigation involving our national capital markets."). Nowhere in SLUSA, PSLRA, NSMIA, or more generally in the 1933, 1934, or 1940 Acts, are variable annuities exempted from the reach of the federal securities statutes. In fact, the 1933 Act provides a specific exemption for insurance products and annuities. Section 3(a)(8) of the Securities Act of 1933 states that

> the provisions of [the Securities Act of 1933] shall not apply to any of the following classes of securities: Any insurance or endowment policy or annuity contract or optional annuity contract, issued by a corporation subject to the supervision of the insurance commissioner, bank commissioner, or any agency or officer performing like functions, of any State or Territory of the United States or in the District of Columbia. . . .

15 U.S.C. § 77c(8). However, since the Supreme Court's decision in *VALIC* in 1959, this exemption has not applied to variable annuities. *See* 359 U.S. at 70–72, 79 S.Ct. 618. Moreover, section 3(c)(3) of the Investment Company Act of 1940 provides an exception for insurance companies from the definition of "investment company." 15 U.S.C. § 80a–3(c)(3). Yet, since *VALIC,* issuers of variable annuities, including the separate accounts of insurance companies, were excluded from this excep-

tion. *See* 359 U.S. at 70–72, 79 S.Ct. 618; *see also Prudential Ins. Co. of Am.*, 326 F.2d at 388. Thus, for over forty years, variable annuities have been subject to the 1933 Securities Act and the 1940 Investment Company Act. There is no indication in SLUSA, NSMIA, or PSLRA that Congress intended to alter this longstanding state of affairs.

For similar reasons, the plaintiffs' arguments based on NSMIA also fail. Because SLUSA defines "covered security" by reference to Section 18(b) of the Securities Act of 1933, which was added to that Act by NSMIA, the intention of Congress when passing NSMIA is relevant to interpreting SLUSA. The plaintiffs devote a great deal of their briefs to the argument that Congress never intended to reach variable annuities in NSMIA. We need not individually address each of the plaintiffs' arguments based on NSMIA; instead, we simply note that NSMIA further supports the application of SLUSA to variable annuities. Most telling is the fact that NSMIA itself includes specific references and provisions relating to variable insurance products, strongly indicating that Congress intended NSMIA to apply to variable annuities. Several provisions of NSMIA directly address variable insurance products, including provisions that govern the fees that insurance companies are permitted to impose when issuing variable annuities. *See* Pub.L. No. 104–290 § 205 (codified at 15 U.S.C. §§ 80a–26(e) & 80a–27(b)). Because NSMIA includes references to variable annuities, we may conclude that Congress legislated while aware of these products. With this awareness, it chose a definition of covered security that unambiguously encompasses variable annuities. Therefore, we find it difficult to accept the plaintiffs' argument that variable annuities were not meant to be reached by NSMIA. *See Lutheran Bhd.*, 105 F.Supp.2d at 1040 ("[T]he dis-

cussion of variable insurance policies in NSMIA demonstrates that Congress viewed variable insurance products as part of, or related to, the problem it wished to correct. There is no internal statutory discord, or ambiguity, which compels the need to examine the statutory history at all. SLUSA applies to the claims based on variable insurance policies . . . .").

■ Finally, the last statute to which the plaintiffs appeal, the Gramm–Leach–Bliley Act of 1999 ("Gramm–Leach"), also fails to support their position. First, as a general matter, legislative acts that are subsequent to the statute to be interpreted provide little evidence of the intentions of the earlier Congress. *See United States v. Estate of Romani*, 523 U.S. 517, 536, 118 S.Ct. 1478, 140 L.Ed.2d 710 (1998) ("[L]ater enacted laws . . . do not declare the meaning of earlier law.") (internal quotation omitted) (Scalia, J., concurring). Because Gramm–Leach was passed in 1999 by a later Congress than that which enacted SLUSA, few conclusions can be reached regarding the earlier statute. But more importantly, Gramm–Leach addressed only the relationship between the banking and insurance industries. It has no application to the division of authority over variable annuities as specified by SLUSA. Moreover, while the impact of McCarran–Ferguson will be discussed in detail below, the fact that it was reaffirmed by Gramm–Leach has no impact on our assessment. It is only because we presume Congress to legislate with the dictates of McCarran–Ferguson in mind that this statute impacts our assessment of SLUSA. Therefore, the fact that Congress reaffirmed McCarran–Ferguson after enacting SLUSA does little to inform our analysis.

Thus, when considered in concert with other recently enacted statutes, as well as the more venerable securities statutes that

they amend, we conclude that SLUSA was intended to reach variable annuities.

### C. History of Variable Annuity Regulation

The plaintiffs also argue that the history of regulation of variable annuities compels the conclusion that Congress could not have intended SLUSA to preempt state insurance law. Since the inception of variable annuities, federal securities regulators and state insurance authorities have erected a coexistent regulatory scheme. *See, e.g., VALIC*, 359 U.S. at 68–69, 79 S.Ct. 618 (applying federal securities law to variable annuities but noting that "the regulation of 'insurance,' though within the ambit of federal power, has traditionally been under the control of the States." (citation omitted)). The plaintiffs argue that application of SLUSA to variable annuities would disrupt this longstanding state of affairs.

We agree that the history of insurance regulation demonstrates that Congress intended a system of dual federal and state authority. *See, e.g., Humana Inc. v. Forsyth*, 525 U.S. 299, 308–09, 119 S.Ct. 710, 142 L.Ed.2d 753 (1999). We further agree that this history may inform our understanding of the meaning of SLUSA. *See Koh*, 199 F.3d at 638. But we do not agree that this history necessarily precludes Congress from intending that the limited preemptive effect of SLUSA apply to variable annuities. SLUSA has a targeted and narrow scope. To illustrate the limited reach of SLUSA, it is helpful to note what is *not* preempted by the statute:

(1) Individuals may still bring suits based on state law or in state court for fraudulent sales of variable annuities, but not in a class action context.

(2) All state regulation of variable annuities not relating to fraud in the sale of such contracts remains in full force and effect.

(3) The statute explicitly excepts certain actions from the reach of the statute:
- certain actions based upon the law of the state in which the issuer of the security is incorporated, 15 U.S.C. § 77p(d)(1).
- actions by states, political subdivisions, and state pension plans, so long as the entity is a named plaintiff and has authorized participation in the action, 15 U.S.C. § 77p(d)(2).
- actions by an indenture trustee against an issuer seeking to enforce contractual provisions of the indenture, 15 U.S.C. § 77p(d)(3).
- shareholder derivative actions, 15 U.S.C. § 77p(f)(2)(B).

Application of SLUSA to variable annuities would impact state law only when private plaintiffs bring suit alleging fraud in the sale of variable annuities based on state laws within a class action context. With such a narrow preemptive effect, the plaintiffs' claim that SLUSA would eviscerate the longstanding federal-state regulatory relationship for variable annuities rings hollow. Moreover, judicial interpretations of the securities statutes in regard to variable annuities must also provide background context against which we gauge congressional action. *See Lorillard v. Pons*, 434 U.S. 575, 580, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute. . . ."). In *VALIC*, 359 U.S. at 70–72, 79 S.Ct. 618, and then later in *SEC v. United Benefit Life Insurance Co.*, 387 U.S. 202, 210–211, 87 S.Ct. 1557, 18 L.Ed.2d 673 (1967), the Supreme Court explicitly held that variable insurance products were subject to federal law, stating in no uncertain terms that variable annuities are securities. Thus, we presume Congress to be aware of judicial

interpretations deeming that variable annuities are securities and subject to the federal securities statutes. *See Lorillard,* 434 U.S. at 580, 98 S.Ct. 866. Given this awareness, we may assume that Congress did not employ a definition of covered security that encompassed variable annuities by mere happenstance. *See, e.g., Conn. Nat'l Bank v. Germain,* 503 U.S. 249, 253–54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there."). Instead, within a statute specifically directed at the securities industry, it chose a definition that unambiguously included variable annuities. This supports the commonsense proposition that Congress intended to reach all securities, even those that also possess certain characteristics of insurance.

Had Congress intended to exclude variable annuities from the reach of SLUSA, it certainly could have provided an exception—as it did for several other classes of litigation concerning covered securities. The presence of these exceptions demonstrates that Congress was aware of the impact of the broad preemptive provisions in SLUSA. And because Congress delineated certain exceptions to the general preemptive force of SLUSA, we are reluctant to impose additional exceptions, particularly when such exceptions are unsupported by the text, history, or purpose of the statute. *See Pauley v. BethEnergy Mines, Inc.,* 501 U.S. 680, 719, 111 S.Ct. 2524, 115 L.Ed.2d 604 (1991) ("When a provision sets forth a general rule followed by specific exceptions to that rule, one must assume-absent other evidence—that no further exceptions are intended.") (Scalia, J., dissenting).

In short, the application of SLUSA's preemptive provisions to variable annuities is not inconsistent with congressional deference to states on insurance matters. And given the high hurdle that the plain language of SLUSA erects, the history of variable annuity regulation does not provide a basis to disregard the unambiguous congressional directive in SLUSA.

### D. Conclusion as to Intent of Congress

In their briefs, the plaintiffs appeal to the history and purposes of SLUSA, the views of legal commentators, other statutes passed before and after SLUSA, and the general history of securities and insurance regulation in this country. But nowhere in this wide-ranging survey are they able to identify clear evidence that application of SLUSA to variable annuities would thwart the will of Congress. Without clear, contrary evidence of legislative intent we must give effect to the plain meaning of the statute. *See United States v. Koh,* 199 F.3d 632, 637 (2d Cir.1999) ("The fact that [the litigant] cannot point to any affirmative statements expressing a congressional intent that would be defeated by giving literal meaning to the statute is fatal to his argument."). In fact, if any conclusion can be reached from the evidence cited by the plaintiffs, it is that Congress intended variable annuities to be within the reach of the statute. SLUSA, when considered in concert with NSMIA and PSLRA, provides a national set of standards for litigation involving allegations of fraud in the securities markets. *See, e.g.,* H.R. Conf. Rep. No. 105–803 (1998). When legislating, Congress did so not only knowing that variable annuities were subject to securities laws, but, in the case of NSMIA, with variable annuities specifically in mind. Yet, despite this, it chose a definition of "covered security" which even the plaintiffs concede unambiguously encompasses variable annuities. With such strong indications that variable

annuities are encompassed by SLUSA, we decline the plaintiffs' invitation to hold otherwise.

## IV. The McCarran–Ferguson Act

The plaintiffs' final claim is that the McCarran–Ferguson Act precludes us from interpreting SLUSA to preempt state regulation of insurance.

The McCarran–Ferguson Act gives states a dominant role in the regulation of insurance. *See United States Dep't of Treasury v. Fabe,* 508 U.S. 491, 500, 113 S.Ct. 2202, 124 L.Ed.2d 449 (1993). McCarran–Ferguson was passed in 1945 in response to the Supreme Court's decision in *United States v. South–Eastern Underwriters Ass'n,* 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944), which held that the business of insurance was interstate commerce, thereby subjecting the insurance industry to federal regulation for the first time. In the wake of that holding, many states feared a federal takeover of insurance regulation, which would threaten the power of states to tax and regulate the insurance industry. *See Fabe,* 508 U.S. at 499–500, 113 S.Ct. 2202. In passing McCarran–Ferguson, Congress restored the supremacy of states in insurance regulation. *See id.* at 500, 113 S.Ct. 2202. McCarran–Ferguson provides in part that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance ... unless such Act specifically relates to the business of insurance...." 15 U.S.C. § 1012(b). This clause establishes what is best described as a "clear-statement rule." *Fabe,* 508 U.S. at 507, 113 S.Ct. 2202. While the federal government has the authority to regulate insurance, federal laws will be presumed not to reach insurance unless Congress expressly states an intent to do so. *See id.*

The plaintiffs contend that because SLUSA does not expressly regulate insurance, and because variable annuities are, at least in part, insurance products, McCarran–Ferguson directs us not to interpret it to preempt the state laws upon which the plaintiffs' claims are based. They center their claim on the Supreme Court decision in *Fabe,* which held that a state statute defining the order of priority of creditors' claims in insurance liquidation proceedings precluded the application of a conflicting federal ordering statute. *See* 508 U.S. at 500–10, 113 S.Ct. 2202. Plaintiffs contend that like the federal ordering statute in *Fabe,* the unintended effect of SLUSA, if applied to variable annuities, would be to interfere with state insurance regulatory systems.

### A. Relevance of McCarran–Ferguson

As a threshold matter, we must first inquire whether McCarran–Ferguson comes into play at all. The McCarran–Ferguson Act serves to "protect state [insurance] regulation primarily against *inadvertent* federal intrusion." *Barnett Bank of Marion County, N.A. v. Nelson,* 517 U.S. 25, 39, 116 S.Ct. 1103, 134 L.Ed.2d 237 (1996). Hartford Life, as well as the SEC as *amicus,* urges that the Supreme Court's decision in *VALIC* establishes that variable annuities are not the "business of insurance."

In *VALIC,* the Supreme Court found that variable annuities are securities because they lack the traditional earmarks of insurance. The Court stated that "we conclude that the concept of 'insurance' involves some investment risk-taking on the part of the company. The risk of mortality, assumed here, gives these variable annuities an aspect of insurance. Yet it is apparent, not real; superficial, not substantial. In hard reality the issuer of a variable annuity that has no element of a

fixed return assumes no true risk in the insurance sense." *VALIC*, 359 U.S. at 71, 79 S.Ct. 618. *See also NationsBank of N.C., N.A. v. Variable Annuity Life Ins. Co.*, 513 U.S. 251, 264, 115 S.Ct. 810, 130 L.Ed.2d 740 (1995) (holding that Comptroller of Currency's holding that annuities, both fixed and variable, are not insurance within the meaning of 12 U.S.C. § 92 (2000) (a provision allowing banks to sell insurance products in towns with less than 5,000 inhabitants) was a reasonable interpretation of the statute and stating that "fixed annuities more closely resemble insurance than do variable annuities...."); *SEC v. United Benefit Life Ins. Co.*, 387 U.S. 202, 211, 87 S.Ct. 1557, 18 L.Ed.2d 673 (1967) ("The basic difference between a contract which to some degree is insured and a contract of insurance must be recognized.").

Because the Supreme Court has held variable annuities to be securities, Hartford Life and the SEC contend that the protections afforded by McCarran–Ferguson are not implicated. Yet, both also concede elsewhere in their briefs that variable annuities are not purely securities, but are hybrid products, possessing at least some characteristics of insurance. *See* Brief for Defendants Appellees at 7 ("Because variable annuities have some insurance features, they are also regulated under state insurance law."); Brief for SEC at 4–5 ("However, because variable annuities also have some insurance features, they are 'hybrid' products that have been and remain subject to extensive regulation by state insurance authorities."). Moreover, in *VALIC*, the Supreme Court acknowledged that variable annuities possess at least some aspects of insurance. *See* 359 U.S. at 71–72, 79 S.Ct. 618. In fact, both the concurring and dissenting opinions took great pains to point out that variable annuities are not solely securities. *See* 359 U.S. at 80–91, 79 S.Ct. 618 (Brennan, J., concurring), 95–96 (Harlan, J., dissenting). As such, we are reluctant to hold categorically that for the purposes of the McCarran–Ferguson Act, variable annuities are not the business of insurance. In any event, we need not decide whether variable annuities are part of the "business of insurance" as defined by McCarran–Ferguson because, as stated below, we find clear indications from Congress that it intended the preemptive effect of SLUSA to reach variable insurance products.

### B. Application of McCarran–Ferguson

The McCarran–Ferguson Act "does not seek to insulate state insurance regulation from the reach of all federal law." *Barnett Bank*, 517 U.S. at 39, 116 S.Ct. 1103. Instead, the statute "seeks to protect state regulation against *inadvertent* federal intrusion...." *Id.* As stated by the Supreme Court in its most recent McCarran–Ferguson decision:

> We reject any suggestion that Congress intended to cede the field of insurance regulation to the states, saving only instances in which Congress expressly orders otherwise. If Congress had meant generally to preempt the field for the States, Congress could have said ... "[n]o federal statute that does not say so explicitly shall be construed to apply to the business of insurance."

*Humana v. Forsyth*, 525 U.S. 299, 308–09, 119 S.Ct. 710, 142 L.Ed.2d 753 (1999) (internal citation, brackets, and emphasis omitted). It is only when a statute, by unintended implication, encroaches on the insurance regulatory regime of a state that McCarran–Ferguson prevents application of the federal statute. *See Barnett Bank*, 517 U.S. at 39, 116 S.Ct. 1103. But when the intended effect of a federal statute is to displace state regulations, we must give

effect to this intent, regardless of whether an insurance company is involved.

For example, in both *Spirt v. Teachers Ins. & Annuity Ass'n*, 691 F.2d 1054, 1065 (2d Cir.1982), *vacated and remanded on other grounds*, 463 U.S. 1223, 103 S.Ct. 3565, 77 L.Ed.2d 1406 (1983), and *Stephens v. Nat'l Distillers & Chem. Corp.*, 69 F.3d 1226, 1232 (2d Cir.1995), we held that when a federal statute clearly intends to displace state law, we should give effect to that intent, even when an insurance company is involved. In *Spirt*, we held that insurance companies are not exempt from the requirements of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq. See* 691 F.2d at 1066. In doing so, we noted that because Title VII contains "a broad and explicit preemptive provision," the concern of the McCarran–Ferguson Act that state insurance laws would be preempted by implication alone was not raised. *Id.* at 1065.

Similarly, in *Stephens*, 69 F.3d at 1231, we held that the Foreign Sovereign Immunities Act ("FSIA") could apply to insurance companies, despite that a broad reading of *Fabe* could yield a different result. Because FSIA preempts all other laws purporting to set rules governing suits against foreign sovereigns, it has a direct and explicit preemptive force. Such a statute should be given effect because Congress intended just such a result. We stated:

> Our precedent in *Spirt* requires us to apply federal law to the insurance industry, in spite of the McCarran–Ferguson Act, whenever federal law clearly intends to displace all state laws to the contrary. The Supreme Court, in *Fabe*, has not ruled otherwise. The normal rules of preemption—which would require us to apply federal law in the face of a conflict between state and federal law even where the federal law does not

explicitly manifest an intent to be preemptive—were altered by the passage of the McCarran–Ferguson Act. That is the essence of *Fabe's* holding. But these rules were not altered so drastically as to force a federal law that clearly intends to preempt all other state laws to give way simply because the insurance industry is involved.

*Id.* at 1233. Like *Spirt* and *Stephens*, here we are asked to construe the scope of a statute that preempts conflicting state law by use of a broad and explicit preemptive provision. And as in our previous cases, we find it compelling that Congress intended SLUSA to have precisely this preemptive effect. Moreover, as in those earlier cases, here Congress legislated in an area of national concern. In *Spirt* and *Stephens* we noted that civil rights and international affairs are issues of national importance that demand national solutions. *See Spirt*, 691 F.2d at 1065–66; *Stephens*, 69 F.3d at 1232–33. Here, Congress passed SLUSA to provide uniform, national standards for litigation concerning a defined set of nationally marketed securities (of which variable annuities are a part)—a topic undisputably of national concern. *See* SLUSA, Pub.L. No. 105–353 § 2(5) ("[I]t is appropriate to enact national standards for nationally traded securities. . . .").

In addition, in *Humana*, 525 U.S. at 310, 119 S.Ct. 710, the Supreme Court stated that "[w]hen federal law does not directly conflict with state regulation, and when application of the federal law would not frustrate any declared state policy or interfere with a State's administrative regime, the McCarran–Ferguson Act does not preclude its application." In *Humana*, the Court found that RICO's treble damage provision did not conflict with state insurance regulation because the federal statute neither directly conflicted with a

state statute nor impaired the regulatory regime of the state. *See id.* Similarly, here, application of SLUSA would neither frustrate Connecticut insurance regulation nor directly conflict with any Connecticut statute enacted to regulate insurance.

■ The plaintiffs claim that "if construed to include variable insurance products, [SLUSA] would preempt nearly all state insurance regulation applicable to these products." Brief for Plaintiffs–Appellants at 46. This is clearly hyperbole. Nothing in our holding today impedes a state's ability to police fraud or other matters that may arise regarding variable annuities' insurance characteristics. SLUSA's preemptive effects are narrow and limited, prohibiting only class actions brought by private individuals that are based on state law and allege fraud in the sale of covered securities. Yet the plaintiffs have failed to bring forward any policy of the State of Connecticut, as articulated by a statute or administrative regulation, that identifies private class action litigation as part of the Connecticut insurance regulatory system. More importantly, because SLUSA applies only to class actions brought by private individuals, the administrative regime of Connecticut is left entirely untouched. In fact, SLUSA expressly preserves the enforcement powers of state regulators. *See* Pub.L. No. 105–353 § 2(5) ("[I]t is appropriate to enact national securities standards for securities class action lawsuits involving nationally traded securities, while preserving the appropriate enforcement powers of State

securities regulators...."); 15 U.S.C. § 77p(e) ("The securities commission (or any agency or office performing like functions) of any State shall retain jurisdiction under the laws of such State to investigate and bring enforcement actions."). State authorities may continue to enforce existing or new securities and insurance regulations concerning the sale of variable annuities in precisely the same manner as they have in the past. For this reason, the plaintiffs have failed to identify a "declared state policy" that SLUSA would frustrate, or an aspect of Connecticut's administrative regime that would be inhibited by application of SLUSA to variable annuities. *Humana,* 525 U.S. at 310, 119 S.Ct. 710; *see also SEC v. Nat'l Secs., Inc.,* 393 U.S. 453, 461, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969) ("[I]t has never been held that state regulation of insurance securities preempts federal regulation, on the theory that the federal securities laws would be superseding state laws regulating the business of insurance.") (internal quotation omitted).

Nor does SLUSA directly conflict with any state statute enacted to regulate insurance. Although not yet conclusively decided by the Connecticut Supreme Court, most federal and Connecticut state courts have determined that the Connecticut Unfair Insurance Practices Act ("CUIPA")— the only law employed by the plaintiffs that was enacted for the purpose of regulating insurance—does not provide a private cause of action.[6] *See, e.g., Peterson v.*

---

**6.** Of the statutes and doctrines employed by the plaintiffs, only CUIPA is eligible for protection under McCarran–Ferguson because only it was "enacted ... for the purpose of regulating insurance." 15 U.S.C. § 1012(b). The common law doctrines employed by the plaintiffs—which include the doctrines of fraud, fraudulent concealment, deceit, breach

of fiduciary duty, negligent misrepresentation, negligence, unjust enrichment, and imposition of constructive trust—are all of a generic nature and are capable of application to a wide range of contexts. Similarly, the Connecticut Unfair Trade Practices Act ("CUTPA") is a general statute that regulates the conduct of all businesses within the state.

*Provident Life & Acc. Ins. Co.*, No. 3:96 CV 2227, 1997 WL 527369 at *1–2 (D.Conn. July 17, 1997); *Casey v. Reliance Nat'l Indem. Co.*, No. CV 970140513, 1998 WL 211838 at *2 (Conn.Super.Ct. April 22, 1998); *Joseph v. Hannan Agency, Inc.*, No. 323310, 1997 WL 15424, at *1 (Conn.Super.Ct. Jan.9, 1997); *Stabile v. S. Conn. Hosp. Sys., Inc.*, No. 326120, 1996 WL 651633, at *3 n. 6 (Conn.Super.Ct. Oct.31, 1996); *Brothers v. Am. Home Assurance Co.*, No. 94–0364725-S, 1995 WL 519881, at *2–3 (Conn.Super.Ct. Aug.24, 1995). While we must defer to the Connecticut Supreme Court on issues of state law, "where there is no decision by the state's highest court then federal authorities must apply what they find to be the state law after giving proper regard to relevant rulings of other courts of the State." *Travelers Ins. Co. v. 633 Third Assocs.*, 14 F.3d 114, 119 (2d Cir.1994) (quoting *Comm'r v. Estate of Bosch*, 387 U.S. 456, 465, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967)).[7] Moreover, in *Mead v. Burns*, 199 Conn. 651, 509 A.2d 11, 15–16 (Conn. 1986), the Connecticut Supreme Court characterized CUIPA as a penal statute requiring a construction "limiting rather than expanding civil liability"—further supporting the proposition that no private cause of action is available under the statute. Therefore, application of SLUSA's provisions invalidating private causes of action (in a class action context) under Connecticut law for fraudulent sales practices would not conflict with CUIPA because CUIPA does not provide a private cause of action.[8]

McCarran–Ferguson functions as a directive to the judiciary that we should presume that Congress intends to defer to state insurance regulation. Thus, when presented with a statute that, by apparently unintended implication, would interfere

See Conn. Gen.Stat. § 42–110b(a) ("No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."). Although CUTPA may be applied to the insurance industry, to enjoy the protections of McCarran–Ferguson, a statute must be more than just capable of application to insurance, but must have been "enacted ... for the purpose of regulating the business of insurance." 15 U.S.C. § 1012(b). *See Hamilton Life Ins. Co. of N.Y. v. Republic Nat'l Life Ins. Co.*, 408 F.2d 606, 611 (2d Cir.1969) (holding that a statute of general applicability was not enacted for the purpose of regulating the business of insurance).

7. In assessing the law of Connecticut, we may look to all the resources that would be available to the Connecticut Supreme Court including determinations of other state courts who have addressed similar issues and scholarly treatment of the subject. *See Travelers Ins. Co.* 14 F.3d at 119. After doing so, we find that a majority of courts which have considered similar laws to CUIPA have concluded that no private cause of action exists. *See, e.g., Peterson*, 1997 WL 527369 at *1 ("An overwhelming majority of jurisdictions now hold that a private cause of action may not be implied under their respective unfair insurance practices acts similar to CUIPA.") (quoting *Stabile*, 1996 WL 651633, at *3); *Moradi-Shalal v. Fireman's Fund Ins. Cos.*, 46 Cal.3d 287, 250 Cal.Rptr. 116, 758 P.2d 58, 63–65 (Cal.1988) (overruling past decision that allowed a private cause of action after noting that seventeen of nineteen states have rejected a private cause of action under similar unfair insurance practices acts and an abundance of scholarly criticism of its prior holding).

8. The plaintiffs argue that Connecticut courts have allowed plaintiffs to maintain a private cause of action under CUTPA for a violation of the provisions of CUIPA. *See Mead*, 509 A.2d at 18. However, as discussed earlier, CUTPA is a statute of general applicability, and therefore was not enacted for the purpose of regulating the business of insurance. That state law allows insurers to be liable under CUTPA does not create a conflict between SLUSA and CUIPA. If any conflict between SLUSA and CUIPA exists, it is indirect at best and not a "direct conflict" as required by the Supreme Court in *Humana*, 525 U.S. at 310, 119 S.Ct. 710.

with state insurance law, we will presume that Congress did not intend such an effect. *See Barnett Bank*, 517 U.S. at 39, 116 S.Ct. 1103. But here, where the preemptive force of SLUSA is explicit, and where we have strong indications that Congress intended just such an effect, we find that application of McCarran–Ferguson to bar SLUSA from applying to variable annuities would undermine, rather than uphold, the will of Congress. Therefore, we hold that McCarran–Ferguson does not preclude the application of SLUSA to variable annuity contracts.[9]

## CONCLUSION

The text, history, and statutory context of SLUSA indicate that Congress intended variable annuities to fall within the scope of the statute. And given the explicit preemptive effect of SLUSA, we find that the McCarran–Ferguson Act does not mandate a different conclusion. Thus, the District Court properly found that the plaintiffs' claims were subject to exclusive federal jurisdiction and that their state law claims were barred by SLUSA. The District Court, therefore, properly dismissed the plaintiffs' complaint.

Accordingly, the judgment of the District Court is AFFIRMED.

9. The plaintiffs urge that should we find for the defendants in the instant case, we would at the same time be holding that NSMIA applies to variable annuities because the two share a common definition of "covered security." We disagree. The application of SLU-SA to variable annuities does not necessarily mean that the same conclusion must be reached in regard to NSMIA. Indeed, due to the broader preemptive provisions in NSMIA, application of McCarran–Ferguson to NSMIA would, we surmise, be a more complex task.