326 F.2d 383
 The PRUDENTIAL INSURANCE COMPANY OF AMERICA, Petitioner,
v.
SECURITIES AND EXCHANGE COMMISSION, Respondent,
Investment Company Institute, Intervenor,
Commissioner of Banking and Insurance of the State of New Jersey, Intervenor.
 No. 14370.
 United States Court of Appeals Third Circuit.
 Argued October 22, 1963.
 Decided January 20, 1964.
 
 Richard J. Congleton, Newark, N. J., for petitioner; Lawrence J. Latto and Shea & Gardner, Washington, D. C., of counsel.
 Allan F. Conwill, Director Division of Corporate Regulation Securities and Exchange Commission, Washington, D. C., for respondent; Philip A. Loomis, Jr., Gen. Counsel, Walter P. North, Associate Gen. Counsel, George P. Michaely, Jr., Sp. Counsel, Robert L. McCloskey, Atty., Securities and Exchange Commission, Washington, D. C., on the brief.
 Steven S. Radin, Deputy Atty. Gen., Trenton, N. J., for Commissioner of Banking and Insurance of the State of New Jersey; Arthur J. Sills, Atty. Gen. of New Jersey, Trenton, N. J., on the brief.
 Robert L. Augenblick, New York City, for Investment Co. Institute; Joseph B. Levin, of Brown & Lund, Washington, D. C., of counsel, on the brief.
 Harry Heller, Washington, D. C., amicus curiae; Marc A. White, Gen. Counsel National Association of Securities Dealers, Inc., Washington, D. C., on the brief.
 Before STALEY and GANEY, Circuit Judges, and NEALON, District Judge.
 STALEY, Circuit Judge.
 
 
 1
 The narrow but provocative question posed by this case is whether the Investment Company Act of 1940, 15 U.S.C. § 80a applies to the Investment Fund resulting from the sale of variable annuity contracts to members of the public by The Prudential Insurance Company of America. The Securities and Exchange Commission answered this question in the affirmative, rejecting the view of Prudential that the Act exempts such a program because the contracts are offered and sold by an insurance company. The case is before us on the petition of Prudential for review of the order of the Commission entered pursuant to that determination.
 
 
 2
 Though there are variations in the form of the variable annuities which Prudential proposes to sell,[1] their salient characteristics are not disputed and their nature has been concisely summarized by the Commission in its opinion in this case:
 
 
 3
 "In substance, the variable annuity contracts which Prudential proposes to sell to individuals provide that the purchaser will make monthly purchase payments of fixed amounts over a period of years (the `pay-in' period), the proceeds of which, after certain deductions, will be invested in a portfolio of securities. The purchaser will be credited monthly with `units' representing his proportionate interest in this fund. The value of these units will fluctuate, essentially depending upon the investment results of the fund. During the annuity, or `pay-out' period, Prudential guarantees that the purchaser will receive in cash the varying value of a fixed number of units as monthly annuity payments.
 
 
 4
 "Specifically the payments made by the purchasers will be placed in a `Variable Contract Account' which will be managed by Prudential and be subdivided into two accounts. The first, the `Investment Fund' account, will have its assets invested primarily in common stocks and will constitute the fund in which the purchasers hold units; this account will be dedicated solely to the variable annuity contract holders and its assets will not be subject to claims of any other contract or policyholder of the company. The second, the `Other Assets' account, an administration account, will receive the amounts deducted from the purchase payments to cover administration expenses, sales commissions, and certain taxes, and to provide a surplus or reserve for the obligations to purchasers contained in the contracts. Transfers will be made periodically from the Other Assets account to the Investment Fund account to meet the contractual requirements that the assets of the latter be equal to the company's existing obligations under the variable contracts. Any excess over the amounts estimated to be needed for the foregoing purposes may be declared as so-called `dividends' which will provide additional fund units or cash payments for the contract holders; it will also be available to support the guarantees on contracts administered by Prudential's other operations. Any deficiency resulting from lower mortality than assumed, for example, will be met out of the general surplus of Prudential.
 
 
 5
 "During the pay-in period a purchaser will have the right to terminate the contract and receive the value of all units credited to his account, less certain termination charges. If a purchaser should die during the pay-in period, the contract is automatically terminated and his beneficiary is paid the greater of (i) the value of all units credited to the purchaser's account or (ii) an amount equal to the total of all purchase payments made.
 
 
 6
 "Absent death or redemption, the pay-in period normally runs for at least 15 years. Thereafter, during the pay-out period, the variable annuitant is entitled to receive each month the current value of a fixed number of units determined at the end of the pay-in period. This number of units is calculated on the basis of the number of units accumulated by the purchaser during the pay-in period, an assumed annual investment increment of 2½% from dividend and interest income, and actuarial computations which take into account the length of the payout period anticipated in light of the age and sex of the purchaser and any co-annuitant. The value of the variable unit during the pay-in and payout periods will be determined at the end of each month and will reflect the changes in the market value of the securities in the Investment Fund account, realized gains and losses, and dividend or interest income. Deductions will be made for investment advisory and other expenses in an amount equal to 0.6% per annum of the value of the fund's assets and for taxes."
 
 
 7
 Prudential concedes that such contracts have been held to be "securities" within the meaning of the Securities Act of 1933, Securities and Exchange Commission v. Variable Annuity Life Insurance Co. [hereinafter called "VALIC"], 359 U.S. 65, 79 S.Ct. 618, 3 L.Ed.2d 640 (1959), and it is willing to register them under that Act. Prudential argues, however, that the Investment Company Act of 1940 specifically excludes insurance companies from its scope.[2] The Commission acknowledged that Prudential is excluded from the Act, but held that the fund created by the sale of the contracts, which is to be used for investment purposes, gives rise to a separate investment company within the coverage of the statute. The Commission concluded that Prudential is not itself an investment company but is the creator of one, and proposes to be its investment adviser and principal underwriter.[3]
 
 
 8
 In this court, Prudential, premising its argument on the insurance company exclusion, asserts that this construction of the statute is inordinately complicated, abstruse, and without basis in law. It asserts that the statute is plain and forecloses Commission jurisdiction in this case. However, since it is conceded that Prudential is excluded from the Act, the issue is narrowed to the question of whether the Commission made a permissible interpretation in concluding that the variable annuity program results in the creation of a separate, non-exempt investment company.
 
 
 9
 Of course, in resolving this issue we start with the premise that securities legislation must be broadly construed in order to insure the investing public a full measure of protection. Securities and Exchange Commission v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 84 S.Ct. 275, 11 L.Ed.2d 237 (Dec. 9, 1963); Securities and Exchange Commission v. Ralston Purina Co., 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494 (1953); Securities and Exchange Commission v. W. J. Howey Co., 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). The parties agree that the statutory definitions contained in the Investment Company Act of 1940 are cast in broad terms. The critical term is "company", which, so far as relevant to our discussion, is defined as "a trust, a fund, or any organized group of persons whether incorporated or not." 15 U.S.C. § 80a-2(a) (8).
 
 
 10
 The Commission determined that the variable annuity contracts constitute the purchasers an "organized group of persons"; that they create a "trust" held by Prudential for these purchasers; and, more importantly, that the separate Investment Fund resulting from the sale of the variable annuity contracts is a "fund" within the statutory definition. Based upon this last decisive holding, the Commission then concluded that the Investment Fund is the "issuer" of the variable annuity securities, and that it is an "investment company" subject to the Act.[4]
 
 
 11
 On this score Prudential argues that the Act regulates only identifiable business entities with some sort of internal organization, and that it is the only such entity involved in this program. Thus, it is asserted that the purchasers cannot be described as an "organized group of persons"; that the plan has no elements of a common-law trust; and that the "fund" referred to in the Act means a mutual fund or any other similar entity, but not Prudential's Investment Fund. But, as Mr. Justice Brennan has cogently observed, the regulatory provisions of the Act "are of particular relevance to situations where the investor is committing his funds to the hands of others on an equity basis, with the view that the funds will be invested in securities and his fortunes will depend on the success of the investment." VALIC, 359 U.S. at 79, 79 S.Ct. at 626, 3 L.Ed.2d 640 (concurring opinion). Furthermore, a study of the legislative history of the Act shows that Congress intentionally drafted the statutory definitions in general terms in order to control such situations regardless of the legal form or structure of the investment enterprise.
 
 
 12
 Initially, it must be noted that the Committee reports of both the House and the Senate state that the legislation was drafted principally on the basis of reports submitted by the Securities and Exchange Commission following an extensive study of investment trusts and investment companies undertaken at the direction of Congress. H.R.Rep.No.2639, 76th Cong., 3rd Sess. 5-6 (1940); S. Rep.No. 1775, 76th Cong., 3rd Sess. 1, 5 (1940). The Act itself contains a similar acknowledgment. 15 U.S.C. § 80a-1. The significance of such reports in ascertaining the intent of Congress in enacting securities legislation was recently underscored by the Supreme Court in Securities and Exchange Commission v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963).
 
 
 13
 Among the various types of investment companies referred to in the exhaustive report of the Commission were those involving "an agency relationship between the individual contributors to the fund and the management upon whom they confer substantially a power of attorney to act as agent in the investment of the moneys contributed. The group of individual investors is not a legal entity but rather constitutes in essence a combination of distinct individual interests." (Emphasis supplied.) H.R.Doc.No.707, 75th Cong., 3rd Sess. 24 (1939). Additionally, the report made specific reference to an investment company known as the "Alexander Fund" which it described as "merely a descriptive name given to the commingled funds of numerous investors who employed W. Wallace Alexander as their agent to invest such funds." Id. at 46. Similarly, in describing the nature of the investment enterprises which Congress was seeking to control, the House Report quotes from the testimony of Commissioner Healy who stated that "Essentially these organizations are large liquid pools of the public's savings entrusted to managements to be invested." H.R.Rep.No.2639, 76th Cong., 3rd Sess. 6 (1940).
 
 
 14
 In these circumstances we reject Prudential's argument that the broad statutory phrase "a trust, a fund, or any organized group of persons whether incorporated or not" refers only to recognizable business entities. On the contrary, the legislative history compels the conclusion that Prudential's Investment Fund is a "fund" as that term is used in the statute. As we have previously seen, the Investment Fund is a completely segregated account, devoted to investing in securities. The cash for these investments is derived from payments made by the purchaser of the variable annuity contract. Though the proceeds of the fund are held for the sole benefit of the annuitant, it is this fund, and no other entity, in which he has an interest.[5] Thus, the fund is separable from the insurance company which, as the Supreme Court noted in VALIC, "guarantee[s] nothing to the annuitant except an interest in a portfolio of common stocks or other equities — an interest that has a ceiling but no floor." 359 U.S. at 72, 79 S.Ct. at 621-622, 3 L.Ed.2d 640. The restricted interest of the annuitant is perhaps best expressed in the Court's pithy observation that he "gets only a pro rata share of what the portfolio of equity interests reflects — which may be a lot, a little, or nothing." 359 U.S. at 71, 79 S. Ct. at 621-622, 3 L.Ed.2d 640.
 
 
 15
 It follows from this that the Investment Fund, and not Prudential, is the "issuer" of these securities for the purposes of the Investment Company Act of 1940. As the Commission observed, "Prudential would in fact be the writer of the contracts — the insurance and annuity promises and the obligation to set up the investment fund. But the investment fund, the `company' to which the investment interests relate, is the `issuer' of those interests."[6]
 
 
 16
 One of the principal arguments of Prudential in favor of exclusion is that the existence of adequate state regulation was the basis for the exemption of insurance companies. But this line of argument was conclusively rejected by the Supreme Court in VALIC for the reason that variable annuities are "securities" and involve considerations of investment not present in the conventional contract of insurance. Prudential attempts to distinguish VALIC on the grounds that the company there involved was not, on the basis of the Court's decision, primarily or predominantly engaged in the business of writing insurance. But regardless of the merits of this distinction, that case holds unequivocally that adequate state regulation of insurance is immaterial when variable annuity contracts are being considered under a Federal statute.
 
 
 17
 Prudential also asserts that the specific exemption provided for the common trust funds of banks shows that regulation under the Act was imposed on an institutional rather than on a functional basis. It is pointed out that this exemption is provided in addition to the general exemption for banks. Prudential declares that such common trust funds are functionally indistinguishable from investment companies, but were excluded from the Act "because they were in fact part of the banking business and intended to be covered by the broad exemption for banks." We think that this specific exemption leads to the opposite conclusion, for as the Commission reasoned:
 
 
 18
 "* * * Obviously, if as Prudential argues, the exemption of banks and insurance companies had been intended to include an exemption of funds set up by such companies, there would have been no need to provide for the additional specific exemption of funds set up by banks. Congress thus viewed such funds, even though usually maintained as departments of the bank, as separate from the banking business. It rested this exemption on the special considerations that the funds were used for bona fide fiduciary purposes rather than as a medium for general public investment and had only a limited impact in the investment fund picture."
 
 
 19
 Considerations of logic and policy provide further support for our conclusion. The Investment Company Act of 1940 contains significant safeguards for the protection of those who, like the purchasers of variable annuities, invest in "securities." These safeguards, characterized by the Commission as insuring "corporate democracy," include disclosure of investment policy and operating practices, and the regulation of fees, trading practices, and changes in investment policy. See VALIC, 359 U.S. at 79, 79 S.Ct. at 626, 3 L.Ed.2d 640. The mere fact that the investment program in the case at bar is under the aegis of an insurance company ought not to negate compliance with these controls in the absence of compelling circumstances. We find no such circumstances here.
 
 
 20
 We have considered the other contentions advanced by Prudential, but find that they are merely variations on its insurance company exclusion argument and have been fully disposed of by the Commission.
 
 
 21
 The order of the Commission will be affirmed.
 
 
 
 Notes:
 
 
 [1]
 Prudential also intends to offer variable group plans in addition to the individual contracts. However, because the Commission is presently dealing with the problems posed by such plans in its administrative capacity, they were excluded from the scope of its opinion. Accordingly, we do likewise
 
 
 [2]
 Insurance companies are excluded from the definition of "investment company" by 15 U.S.C. § 80a-3(c) (3). An insurance company is earlier defined as "a company which is organized as an insurance company, whose primary and predominant business activity is the writing of insurance or the reinsuring of risks under-written by insurance companies, and which is subject to supervision by the insurance commissioner or a similar official or agency of a State * * *." 15 U.S.C. § 80a-2(a) (17)
 
 
 [3]
 The essence of the Commission's reasoning in this regard is contained in the following excerpt from its opinion:
 "Thus, Prudential is not itself an investment company, but it is the creator of one — and proposes to be its `investment adviser' and `principal underwriter.' That an exempt insurance company performs these functions is irrelevant. The Act's exclusion of insurance companies is to be readily explained: otherwise they would fall within the statute by reason of the investment activities which are a necessary ingredient of their insurance business. Where, however, an insurance company (or any other entity) creates a fund exclusively for investment, and sells equity interests in the fortunes of that fund, the exemption does not carry over to the fund. Furthermore, that Prudential may in the same contract also make, in its own name and backed by its own assets, certain insurance or annuity promises is also irrelevant. VALIC held that such promises do not make the contract as a whole exempt as `insurance' though made by the same entity and backed by the same assets."
 
 
 [4]
 "Issuer" is defined as "every person [natural person or a company] who issues or proposes to issue any security, or has outstanding any security which it has issued." 15 U.S.C. § 80a-2(a) (21)
 "Investment company" means, inter alia, any issuer which "proposes to engage primarily, in the business of investing, reinvesting, or trading in securities." 15 U.S.C. § 80a-3(a) (1).
 
 
 [5]
 It is true that any deficiency in the variable contract account resulting from lower mortality than assumed would be met out of the general surplus of Prudential. However, the actuary for Prudential testified that the deductions provided for in the contract would be more than adequate to satisfy the annuity obligations. Hence, the annuitant's interest in the general assets of Prudential is, at best,de minimis.
 
 
 [6]
 The mere fact that Prudential is the obligor of certain of the insurance and annuity features of the contract is not significant, for the annuitant's investment participation is measured solely by the Investment Fund