**Raymond PATENAUDE, on behalf of himself and the general public, Plaintiff–Appellant,**

v.

**The EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES; AXA Advisors, LLC; Equitable Distributors, Inc., Defendants–Appellees.**

No. 00–56913.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 5, 2002.

Filed May 14, 2002.

Michael C. Spencer, Milberg Weiss Bershad Hynes & Lerach LLP, New York, NY, for the plaintiff-appellant.

Charles C. Platt, LeBoeuf, Lamb, Greene & MacRae, LLP, New York, NY, for the defendants-appellees.

Before: THOMAS, RAWLINSON, Circuit Judges and ARMSTRONG,[1] District Judge.

THOMAS, Circuit Judge.

This appeal presents the question of whether tax-deferred variable annuities are covered securities under the Securities Litigation Uniform Standards Act of 1998 ("SLUSA"), Pub.L. No. 105–353, 112 Stat. 3227 (codified in scattered sections of 15 U.S.C.). We conclude that they are, and affirm the judgment of the district court.

I

Raymond Patenaude sought advice concerning the creation of a retirement plan for his new business from an agent of The Equitable Life Assurance Society of the United States ("Equitable Life"). According to his complaint, Patenaude was advised to establish a simplified employee pension ("SEP")[2] plan with Equitable Life and to fund it with a variable annuity because of the tax benefits that such an arrangement would provide. Relying on the agent's experience and expertise as a financial planner as well as Equitable's reputation as a well-respected company, Patenaude set up a SEP plan and funded it with a variable annuity. Equitable solicited additional investments from Patenaude by emphasizing the tax benefits of its variable annuity.

After contributing to his SEP for several years, Patenaude sought to transfer his retirement savings from Equitable Life to another company. At that time, he alleges that he learned he would incur substantial surrender fees if he wished to transfer his account, and that he had been paying substantial fees for redundant tax benefits.[3]

---

1. The Honorable Saundra Brown Armstrong, United States District Judge for the Northern District of California, sitting by designation.

2. A SEP is an individual retirement account or individual retirement annuity, established pursuant to 26 U.S.C. § 408(k). A SEP is an alternative to the establishment of a more complex qualified pension plan, and is generally used by small business employers.

3. Under the Internal Revenue Code, funds placed in variable annuity contracts are taxed only when the annuitant withdraws them from the account, which makes variable annuities a much more attractive investment from a tax perspective than mutual funds or other equities. However, this tax advantage of variable annuities is irrelevant to investors who are investing funds set aside through an

He then closed his SEP plan with Equitable Life, incurred surrender charges to liquidate the annuity, and filed suit against Equitable Life in California state court on behalf of himself and "the general public."

■ In his complaint, Patenaude alleged that Equitable Life's conduct constituted an unfair and fraudulent business practice in violation of Cal. Bus. & Prof. Code § 17200, and that Equitable Life engaged in acts of false or misleading advertising in violation of Cal. Bus. & Prof. Code § 17500.[4] Equitable Life removed the action to federal court on the basis Patenaude's claims were preempted by SLUSA. Patenaude moved to remand; Equitable Life moved to dismiss. The district court denied the motion to remand and granted the motion to dismiss, concluding that Patenaude's state law claims were preempted by SLUSA. Patenaude appeals. We review a district court's denial of a motion to remand a removed case *de novo*. *Audette v. ILWU*, 195 F.3d 1107, 1111 (9th Cir.1999). We review a district court's dismissal of a complaint for failure to state a claim *de novo*. *Oscar v. Univ. Students Coop. Ass'n*, 965 F.2d 783, 785 (9th Cir.1992) (en banc).

## II

At issue in this appeal is whether federal law prevents Patenaude from asserting state law claims against Equitable Life based upon the misrepresentations Equitable Life allegedly made while marketing and selling variable annuities. The resolution of this issue depends upon whether SLUSA is applicable to and thus preempts Patenaude's state law claims. If so, then the district court properly denied Patenaude's motion to remand and dismissed

the complaint. If not, then the district court did not have subject matter jurisdiction and so should have remanded the case to state court.

■ Patenaude's complaint includes only state law causes of action. Thus, ordinarily the district court would not have subject matter jurisdiction, since "[t]he presence or absence of federal-question jurisdiction is governed by the 'well-pleaded' complaint rule, which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987). "[A] case may *not* be removed to federal court on the basis of a federal defense, including the defense of pre-emption, even if the defense is anticipated in the plaintiff's complaint, and even if both parties concede that the federal defense is the only question truly at issue." *Id.* at 393, 107 S.Ct. 2425 (citing *Franchise Tax Bd. v. Constr. Laborers Vacation Trust*, 463 U.S. 1, 12, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983)) (emphasis in original). However, a statute may so completely preempt state law that it occupies the entire field, barring assertion of any state law claims and permitting removal to federal court. *Id.;* see also *Paige v. Henry J. Kaiser Co.*, 826 F.2d 857, 860–61 (9th Cir.1987). Thus, the district court had subject matter jurisdiction over Patenaude's complaint if, and only if, SLUSA completely preempted the state law claims that Patenaude attempted to assert.

SLUSA provides for the removal and dismissal of class actions brought pursuant to state law alleging misrepresentations in

---

investment vehicle that is already tax-deferred, such as an IRA or a 401(k).

**4.** In addition, on his own behalf, Patenaude alleged liability based on fraud, negligent mis-

representation, and negligence. However, he does not address these claims on appeal. Thus, those issues are waived, and we do not address them. *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1110 n. 1 (9th Cir.2000) (en banc).

connection with the purchase or sale of a covered security. Specifically, SLUSA states:

No covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging (1) an untrue statement or omission of material fact in connection with the purchase or sale of a covered security; or (2) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security.

15 U.S.C. § 77p(b). SLUSA also provides for the removal of such actions from state court to federal court. 15 U.S.C. § 77p(c).

Patenaude does not dispute that his complaint is a "covered class action" alleging that Equitable Life violated state law by making misrepresentations in connection with the purchase of variable annuities. However, Patenaude contends that a variable annuity is not a "covered security" within the meaning of SLUSA.

 SLUSA defines a "covered security" as "a security that satisfies the standards for a covered security specified in paragraph (1) or (2) of section 77r(b) of this title." 15 U.S.C. 77p(f)(3). Section 77r(b), enacted as part of the National Securities Markets Improvement Act of 1996 ("NSMIA"), Pub.L. No. 104–290, 110 Stat. 3416, states that a "security is a covered security if such security is a security issued by an investment company that is registered, or that has filed a registration statement, under the Investment Company Act of 1940." 15 U.S.C. § 77r(b)(2). Variable annuities must be

registered with the Securities and Exchange Commission ("SEC") as securities. *SEC v. Variable Annuity Life Ins. Co. of Am.*, 359 U.S. 65, 69–73, 79 S.Ct. 618, 3 L.Ed.2d 640 (1959). When variable annuities are sold by insurance companies, they must be offered through "separate accounts," [5] as described by the Investment Company Act of 1940. The "separate accounts" must be registered with the SEC as "investment companies," even though the variable annuity products are sold by insurance companies. *Lander v. Hartford Life & Annuity Ins. Co.*, 251 F.3d 101, 105 (2d Cir.2001) (citing *Prudential Ins. Co. of Am. v. SEC*, 326 F.2d 383 (3d Cir.1964)).

No one contests that the variable annuity that Patenaude purchased contained, as an integral component, a separate account created by Equitable Life that permitted the annuity holder to invest in mutual funds and like securities. This separate account was registered with the SEC as an "investment company" under the Investment Company Act of 1940. Thus, by the plain language of the statute as applied to the undisputed facts of this case, the deferred tax variable annuity purchased by Patenaude qualifies as a "covered security" within the meaning of SLUSA.

### III

Patenaude does not dispute that variable annuities satisfy the SLUSA definition of a "covered security." However, Patenaude argues that we should not rely upon this "plain meaning" reading of these particular provisions, but rather should consider the statutes as a whole, their context and purpose, and their legislative history.

---

**5.** A "separate account" is "an account established and maintained by an insurance company pursuant to the laws of any State or territory of the United States, or of Canada or any province thereof, under which income, gains and losses, whether or not realized, from assets allocated to such account, are, in accordance with the applicable contract, credited to or charged against such account without regard to other income, gains, or losses of the insurance company." 15 U.S.C. § 80a–2(a)(37).

Generally, "[i]f the statutory language is clear, that is the end of our inquiry." *A–1 Ambulance Serv., Inc. v. California,* 202 F.3d 1238, 1244 (9th Cir. 2000), *cert. denied,* 529 U.S. 1099, 120 S.Ct. 1833, 146 L.Ed.2d 777 (2000) (citing *Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 253–54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992)). To be sure, the "plain meaning" of a particular statutory provision is not determined by considering the language of that provision in isolation; rather, determining the plain meaning of a statutory provision requires considering the provision at issue in the context of the statute as a whole. *See Robinson v. Shell Oil Co.,* 519 U.S. 337, 340–41, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."); *Carpenters Health & Welfare Trust Funds v. Robertson,* 53 F.3d 1064, 1067 (9th Cir.1995) ("When we look to the plain language of a statute in order to interpret its meaning, we do more than view words or subsections in isolation. We derive meaning from context, and this requires reading the relevant statutory provisions as a whole.").

However, there is nothing in the statutory context, nor in SLUSA's legislative history, that would alter the conclusion that variable annuities are "covered securities" under SLUSA. *See Lander,* 251 F.3d at 114. The best that Patenaude can offer is the "deafening silence" in the legislative history regarding SLUSA's application to securities products marketed by insurance companies. However, we have yet to apply a "dog that didn't bark" theory[6] of statutory construction to reach a contradictory interpretation of unambiguous text.

To the contrary, "absent a clearly expressed legislative intention to the contrary, that language must ordinarily be regarded as conclusive." *Am. Tobacco Co. v. Patterson,* 456 U.S. 63, 68, 102 S.Ct. 1534, 71 L.Ed.2d 748 (1982) (internal quotations omitted). Thus, neither the structure of SLUSA nor its legislative history supports the argument that SLUSA's legislative purpose was not "expressed by the ordinary meaning of the words used" in the statute. *Id.* (internal quotations omitted).

Indeed, if considered, the statutory context and legislative history buttress the broad reach of SLUSA's plain language. SLUSA was an outgrowth of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub.L. 104–67, 109 Stat. 737 (codified in scattered sections of 15 U.S.C.), which was intended to prevent the filing of frivolous securities class action lawsuits by imposing, among other restrictions, heightened pleading requirements. *In re Silicon Graphics Inc. Sec. Litig.,* 183 F.3d 970, 973 (9th Cir.1999). When it became evident that class actions plaintiffs were avoiding PSLRA's requirements by filing class action suits in state courts under state statutory or common law theories, Congress enacted SLUSA to foreclose this alternative. *See Lander,* 251 F.3d at 108 ("SLUSA was passed in 1998 primarily to close this loophole in the PSLRA."). To accomplish this purpose, SLUSA mandated that federal court be "the exclusive venue for class actions alleging fraud in the sale of certain covered securities" and that "such class actions be governed exclusively by federal law." *Id.*

Congress also intended SLUSA to form an integrated statutory scheme with NSMIA. *Id.* NSMIA "preclude[d] states

---

6. A "dog that didn't bark" analogy, so named after the deciding clue in a Sherlock Holmes mystery, is a theory which attempts to prove its own validity based upon the absence of an occurrence. Sir Arthur Conan Doyle, *The Complete Sherlock Holmes,* 400 (1953).

from requiring issuers to register or qualify certain securities with state authorities," thus "preempt[ing] state 'Blue Sky' laws." *Id.* As the Second Circuit concluded in considering a similar challenge:

> When considered in concert, SLUSA, NSMIA, and PSLRA demonstrate that Congress intended to provide national, uniform standards for the securities markets and nationally marketed securities. Through these statutes, Congress erected uniform standards for registration of, and litigation concerning, a defined class of covered securities.... Nowhere in SLUSA, PSLRA, NSMIA, or more generally in the 1933, 1934, or 1940 Acts, are variable annuities exempted from the reach of federal securities statutes .... Thus, for over forty years, variable annuities have been subject to the 1933 Securities Act and the 1940 Investment Company Act. There is no indication in SLUSA, NSMIA, or PSLRA that Congress intended to alter this longstanding state of affairs.

*Id.* at 111–12.

Patenaude further contends that Congress did not intend the definition of "covered security" in NSMIA to include variable annuities, and given SLUSA's incorporation of NSMIA's interpretation of these securities, Congress intended, by implication, to exempt them from the preemptive provisions of SLUSA. However, Patenaude's reliance on congressional silence under NSMIA is misplaced. As discussed more fully by the Second Circuit in *Lander*, specific references to variable annuities are clearly implicated in other portions of NSMIA. *Id.* at 112. This belies Patenaude's assertion that Congress neglected to consider that NSMIA might apply to variable annuities, and by extension, that they would be within the preemptive reach of SLUSA. Had Congress intended to differentiate variable annuities from other securities issued by registered investment companies,

it could, and most likely would, have simply said so. It did not. Consequently, the plain and unambiguous language of SLUSA is dispositive.

## IV

Nor does the McCarran–Ferguson Act, 15 U.S.C. § 1011, *et seq.*, compel a contrary conclusion. The McCarran–Ferguson Act was passed by Congress in 1946 "to restore the supremacy of the States in the realm of insurance regulation." *United States Dep't of Treasury v. Fabe*, 508 U.S. 491, 500, 113 S.Ct. 2202, 124 L.Ed.2d 449 (1993). The Act provides, in relevant part: "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance ... unless such Act specifically relates to the business of insurance." 15 U.S.C. § 1012(b).

■■■■ The McCarran–Ferguson Act does not prevent Congress from regulating insurance. Rather, the effect of the McCarran–Ferguson Act is the avoidance of "*inadvertent* federal intrusion" into state insurance regulation. *Barnett Bank v. Nelson*, 517 U.S. 25, 39, 116 S.Ct. 1103, 134 L.Ed.2d 237 (1996) (emphasis in original). Thus, in accomplishing its ends, the McCarran–Ferguson Act "does not seek to insulate state insurance regulations from the reach of all federal law." *Id.* "It is only when a statute, by unintended implication, encroaches on the insurance regulatory regime of a state that McCarran–Ferguson prevents application of the federal statute." *Lander*, 251 F.3d at 116. Thus, "[w]hen federal law does not directly conflict with state regulation, and when application of the federal law would not frustrate any declared state policy or interfere with a State's administrative regime, the McCarran–Ferguson Act does not preclude its application." *Humana,*

*Inc. v. Forsyth,* 525 U.S. 299, 310, 119 S.Ct. 710, 142 L.Ed.2d 753 (1999). Furthermore, "when the intended effect of a federal statute is to displace state regulations, we must give effect to this intent, regardless of whether an insurance company is involved." *Lander,* 251 F.3d at 116–17.

### A

▉ As has been amply demonstrated, the sale of variable annuities has been subject to federal securities law for more than half a century, even when the variable annuities are sold by insurance companies. *See Variable Annuity Life Ins. Co. of Am.,* 359 U.S. at 70–72, 79 S.Ct. 618. Thus, Congress has consistently indicated its intent, particularly with the passage of SLUSA, to displace state regulation insofar as it relates to the marketing of the securities component of variable annuities.

However, this does not end the analysis because tax-deferred variable annuities are "hybrid" products, that is, they retain some aspects of both a security and an insurance product. To understand the interplay, we must deconstruct the product. "An annuity is a contract between a seller (usually an insurance company) and a buyer (usually an individual, also referred to as the 'annuitant') whereby the annuitant purchases the right to receive a stream of periodic payments to be paid either for a fixed term or for the life of the purchaser or other designated beneficiary." *Lander,* 251 F.3d at 104. Traditional annuities, or annuities in which payment begins immediately or soon after purchase and the contract specifies the amount of each payment, are "typically thought of as insurance products because the annuitant receives a guaranteed stream of income for life, and the insurer assumes and spreads the 'mortality risk' of the annuity—the risk that the annuitant will live longer than expected, thereby receiving benefits that exceed the amount paid to the seller of the policy." *Id.*

In contrast, a deferred annuity is an accumulation product. *Id.* at 104–05. The purchaser invests money and allows the value of the account to grow and then later on draws down the value of the account. *Id.* at 104. In a fixed deferred annuity, the purchaser receives from the insurer an interest rate on the amount of premiums invested by the purchaser. In a variable deferred annuity, the purchaser is not guaranteed a particular rate of return; instead, the purchaser invests in one or more professionally managed diversified investment products, offered through "separate accounts" of the insurance companies, and receives a rate of return that varies depending upon the success of the underlying investment. *Id.* at 105. Although deferred annuities have an investment component, they typically retain two insurance features: a guarantee of monthly payments for life and a benefit that is payable if the annuitant dies before the payout begins. *Id.* Thus, "[v]ariable annuities are typically characterized as 'hybrid products,' possessing characteristics of both insurance products and investment securities." *Id.*

As hybrid products, variable annuities are properly subjects of hybrid regulation. There is nothing inappropriate or inconsistent about the securities component being subject to federal securities regulation and the insurance aspects being subject to state regulation. For that reason, nothing in SLUSA displaces state insurance regulation, nor "invalidate[s], impair[s], or supersede[s] any law enacted by any State for the purpose of regulating the business of insurance." 15 U.S.C. § 1012(b). Rather, SLUSA's purpose is the preemption of private securities class action lawsuits, not the displacement of state insurance regulation. Indeed, SLUSA expressly preserves

state governmental enforcement powers. 15 U.S.C. § 77p(e). Thus, under SLUSA, "[s]tate authorities may continue to enforce existing or new securities and insurance regulations concerning the sale of variable annuities in precisely the same manner as they have in the past." *Lander*, 251 F.3d at 118. Indeed, the only actions that SLUSA preempts are specific types of private party securities class actions based upon state statutory or common law.[7]

### B

▮ Patenaude claims that his action is founded on California's statutory regulation of insurance and thus, under McCarran–Ferguson, SLUSA is inapplicable to his claims. However, in California, there is no private right of action based either on the Insurance Code or regulations adopted thereunder. *Rattan v. United Servs. Auto. Ass'n*, 84 Cal.App.4th 715, 101 Cal. Rptr.2d 6, 12 (2000). Thus, as a general matter, a private suit against an insurer is not part of California's state regulation of insurance.[8]

Nonetheless, Patenaude alleges that California insurance regulation is at least indirectly impacted by his claims that Equitable's conduct constituted an unfair and fraudulent business practice in violation of Cal. Bus. & Prof.Code § 17200 and that Equitable engaged in acts of false or misleading advertising in violation of Cal. Bus. & Prof.Code § 17500. However, these statutes relate to general consumer protection and unfair trade practices; they are not part of California's statutory regulation of insurance. *Manufacturers Life Ins. Co. v. Superior Court*, 10 Cal.4th 257, 41 Cal.Rptr.2d 220, 895 P.2d 56, 61 (1995) (in bank) (noting that the Insurance Code does not create a private right of action and that a plaintiff may not "plead around" that limitation by casting a cause of action based on a violation of another statute).

▮ In short, the phrase "state laws enacted for the purpose of regulating the business of insurance" does not include all laws of general applicability enacted by a state that may impact the insurance industry. Thus, the fact that the insurance industry is not exempt in California from general consumer protection laws, and private causes of action created thereunder, does not mean that the McCarran–Ferguson Act exempts from SLUSA suits based on non-Insurance Code theories.

### C

In sum, because SLUSA does not invalidate, impair, or supersede any California law enacted for the purpose of regulating the business of insurance, the MacCarran–

---

7. As the Second Circuit noted in *Lander*: "To illustrate the limited reach of SLUSA, it is helpful to note what is not preempted by the statute: (1) Individuals may still bring suits based on state law or in state court for fraudulent sales of variable annuities, but not in a class action context. (2) All state regulation of variable annuities not relating to fraud in the sale of such contracts remains in full force and effect. (3) The statute explicitly excepts certain actions from the reach of the statute [such as] ... certain actions based upon the law of the state in which the issuer of the security is incorporated, 15 U.S.C. § 77p(d)(1)[;] ... actions by states, political subdivisions, and state pension plans, so long

as the entity is a named plaintiff and has authorized participation in the action, 15 U.S.C. § 77p(d)(2)[;] ... actions by an indenture trustee against an issuer seeking to enforce contractual provisions of the indenture, 15 U.S.C. § 77p(d)(3)[; and] ... shareholder derivative actions, 15 U.S.C. § 77p(f)(2)(B)." 251 F.3d 101 at 113.

8. Given the previous discussion, it is doubtful that, even if the California Insurance Code provided for a private right of action, the existence of a private right of action in an insurance code would exempt private litigation from SLUSA. However, that issue is not before us, and we need not address it.

Ferguson Act does not exempt Patenaude's action from SLUSA preemption.

## V

 Patenaude also contends that the Gramm–Leach–Bliley Financial Modernization Act of 1999 ("the Gramm–Leach Act"), Pub.L. No. 106–102, 113 Stat. 1338, precludes the application of SLUSA to litigation concerning variable annuity products. However, the primary purpose of the Gramm–Leach Act was to enhance competition in the financial services industry by, among other measures, repealing the Glass–Steagall Act, 12 U.S.C. § 377. Although the Gramm–Leach Act allowed for restructuring of the relationship among insurance companies, banks and securities firms, "[i]t has no application to the division of authority over variable annuities as specified by SLUSA." *Lander*, 251 F.3d at 112. In sum, the Gramm–Leach Act did not alter pre-existing law addressing the maintenance of private class action securities litigation pertaining to variable annuities.

## VI

For these reasons, we agree with the district court that removal and dismissal of the instant action was proper under SLUSA.

**AFFIRMED.**