Ring v. AXA Fin., Inc.

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2005

(Argued:  December 20, 2005                    Decided: April 6, 2007)

Docket No. 05-0616-cv

SHIRLEY J. RING, on behalf of herself and others similarly situated,[*]

Plaintiff-Appellant,

-v-

AXA FINANCIAL, INC., and THE EQUITABLE LIFE ASSURANCE SOCIETY OF THE
UNITED STATES,

Defendants-Appellees.

Before:   JACOBS, Chief Judge, STRAUB and POOLER, Circuit Judges.

The district court denied plaintiff Shirley Ring's motion for remand of her class-action complaint, which contained state law claims, and dismissed the complaint on the ground that it was wholly preempted by the Securities Litigation Uniform Standards Act of 1998.

---

[*] The Clerk is directed to amend the official caption to reflect that Ring seeks to represent members of a class.

Vacated and remanded with instructions to remand to state court.

———————

JOSHUA N. ROSE, Rose & Rose, P.C. (Terri N. Marcus, on the brief), Washington, DC, for Plaintiff-Appellant.

JOHN F. CAMBRIA, Alston & Bird LLP, New York, NY, for Defendants-Appellees.

———————

POOLER, Circuit Judge:

The Securities Litigation Uniform Standards Act of 1998 ("SLUSA"), Pub. L. No. 105-353, 112 Stat. 3227 (1998) (codified as amended in part at 15 U.S.C. §§ 77p & 78bb(f)) precludes the maintenance—in state or federal court—of class actions alleging state law violations but premised on deception "in connection with the purchase or sale of a covered security." See 15 U.S.C. § 77p(b). We are now asked to decide whether a Children's Term Rider ("CTR") that is not by itself a "covered security" becomes a "covered security" and thus subject to SLUSA removal and dismissal because it is attached to a variable life insurance policy falling within the definition of a "covered security." The district court found that attachment of the CTR to a policy requires analysis of the CTR and the policy together. Because we disagree and conclude that the CTR and the policy to which it is appended must be considered separately, we vacate and remand with instructions to remand to the New York County Supreme Court.

## BACKGROUND

*A. Factual and Procedural.*

In 1982, Shirley Ring purchased an adjustable whole life policy on her own life in the amount of $10,000 from the Equitable Life Assurance Society of the United States

2

("Equitable").[1] Ring added a CTR covering her then twelve-year-old daughter Stacy. The CTR promised a death benefit if Stacy died "before the earlier of: (a) the child's 25th birthday" or "(b) the expir[ation] [d]ate of th[e] rider." The policy itself recited that premiums for the CTR would be paid for twenty-nine years. The CTR provides that it "is a part of the policy [and] [i]ts benefits are subject to all the terms of this rider and the policy."

Pursuant to the policy, when Stacy turned twenty-five on March 28, 1994, she was no longer covered by the CTR. Equitable, however, continued and continues to bill Shirley Ring for coverage from which she can receive no benefit.

In August 2004, Ring filed a class action complaint in New York County Supreme Court in August 2004. The complaint is brought on behalf of all "individuals: who 1) purchased an insurance policy with Equitable with a Children's Term Insurance Rider . . .; and 2) paid money to Equitable for their children to be covered by the Child Rider after their children reached age 25."[2] Ring claimed that Equitable violated New York General Business Law § 349 and committed several state torts by continuing to charge for the CTR after it no longer could provide coverage. On September 16, 2004, Equitable removed the lawsuit to federal court pursuant to SLUSA. Ring subsequently moved to remand the lawsuit to state court, and Equitable moved to dismiss the state law claims as wholly preempted by SLUSA. In conjunction with these motions, Equitable offered proof that, in addition to selling CTRs with whole life policies like the one Ring purchased, it offered CTRs with variable life insurance policies. It also offered a copy of an SEC registration for the Separate Account, FP, which serves to fund its

---

[1] The other defendant, AXA Financial Inc., is Equitable's parent.

[2] The class was not certified prior to removal.

3

purchases of investments for persons holding variable life insurance policies.

In an oral decision, the district court denied Ring's motion and granted Equitable's. It found that SLUSA preempted the claims of those putative class members who purchased variable life policies and therefore dismissed those claims with prejudice. Because whole life insurance policies are not "covered securities," the dismissal as to the whole life claims was without prejudice.

*B. Legal Landscape.*

In reaction to the 1929 failure of the securities market, Congress enacted the Securities Act of 1933 and the Securities Exchange Act of 1934. See Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 170-71 (1994). Together, the two acts delegated to the Securities and Exchange Commission ("SEC") substantial power to regulate the initial distribution and subsequent sale of securities. See id. The section of the Securities Exchange Act of 1934 with which the courts are most familiar is Section 10(b), 15 U.S.C. § 78j. Along with its implementing regulation, Rule 10b-5, 17 C.F.R. § 240.10b-5, Section 10(b) prohibits deception, misrepresentation, and fraud in connection with the sale or purchase of securities.

Because individual shareholder losses due to deception, misrepresentation, or fraud can be calculable, but insignificant, shareholders have come to rely on class actions to vindicate their rights. In 1995, Congress concluded that many of the resulting class actions were frivolous and could negatively impact interstate commerce and, particularly, nationally traded securities. These problems were significant enough, in Congress's view, to require a heightened bar for such litigation. See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit, 547 U.S. 71, 126 S. Ct. 1503, 1510-11 (2006).

4

As a result, Congress enacted the Private Securities Litigation Reform Act ("PSLRA") which, inter alia, limits recoverable damages and attorneys' fees, provides protections to corporations, mandates sanctions for frivolous lawsuits, and specifies heightened pleading requirements for actions brought pursuant to Section 10(b) and Rule 10b-5. See id. at 1511. However, the PSLRA had an "unintended consequence": the migration of class actions alleging fraud in securities transactions from federal to state court. Id. Citing House and Senate Reports, the Supreme Court explained that "[t]o stem this shif[t] from Federal to State courts and prevent certain State private securities class action lawsuits alleging fraud from being used to frustrate the objectives of the [PSLRA], Congress enacted SLUSA." Id. (internal citations and quotation marks omitted).

SLUSA provides:

No covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging—
    (A) a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security; or
    (B) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security.

15 U.S.C. § 78bb(f)(1).

If a state class action satisfies all the SLUSA criteria, the defendant may remove it to federal district court and the district court must dismiss. Id. § 78bb(f)(2). However, a lawsuit that does not satisfy all the SLUSA criteria must be remanded to state court. Id. § 78bb(f)(3)(D).

**ANALYSIS**

Ring concedes that her lawsuit is a "covered class action" and that it makes state law

5

claims. She contends, however, that the CTR is not a "covered security," and that, in any case, the defendants' alleged fraud did not occur in connection with the sale or purchase of the CTR. Because we conclude that the CTR is not a "covered security," we need not address SLUSA's "in connection with" requirement.

SLUSA defines "covered securities" by reference to paragraphs (1) and (2) of 15 U.S.C. § 77r(b). See 15 U.S.C. § 77p(f)(3). The cited paragraphs define as "covered securities" securities listed on one of the national securities exchanges as well as securities issued by investment companies registered with the SEC. See id. § 77r(b)(1) & (2). Equitable contends that its variable life insurance policy is a "covered security" because it is issued by Equitable's registered separate account.

Insurance has traditionally been regulated by the several states, and the regulatory scheme relating to securities has steered clear of impinging on this state province. Thus, insurance products subject to state regulation are exempt from regulation by the SEC. See id. § 77c(a)(8). But, the line between insurance and securities has softened as insurance companies have sought to offer more sophisticated products to their customers. Even before the passage of the PSLRA and SLUSA, the Supreme Court held that a variable annuity, though sold by an insurance company, was a security and must be registered with the SEC. SEC v. Variable Annuity Life Ins. Co. of Am., 359 U.S. 65, 70-72 (1959) ("VALIC"). It was dispositive, the Court held, that products properly characterized as insurance require the insurer to bear the risks of a poor investment, whereas under a variable annuity contract, the annuitant bears the risks of poor investments. See id.

In Lander v. Hartford Life & Annuity Ins. Co., 251 F.3d 101, 104 (2d Cir. 2001), we

6

applied VALIC in the SLUSA context, holding that class members "who purchased variable annuity policies . . . in connection with a tax-qualified investment plan" were subject to SLUSA preemption. The Lander court read VALIC to hold that the annuities were securities. Id. It then held that the variable life annuities were "covered securities" because insurance companies, although not themselves registered with the SEC, are required to set up separate investment accounts that must be registered with the SEC to market variable annuities. See id. at 104-05.

While Ring herself did not purchase the CTR as part of a variable annuity, other members of the putative class did. Nevertheless, Ring argues that the purchase of variable annuities here at issue is distinguishable from Lander because Equitable, which is not registered with the SEC, rather than Equitable's registered separate account issued the relevant policies. At first blush, this claim appears accurate. When Equitable receives a premium payment for a variable life policy, it places the premium—less expense charges—in the insured's policy account. It then deducts monthly administrative charges, the monthly cost of insurance for the insured person, and the cost of any rider. Finally, at the direction of the insured, Equitable will allocate remaining amounts from the policy account to either its Guaranteed Interest Division or the Separate Account, which is Equitable's investment vehicle. Thus, the policy is sold long before the separate account is utilized. However, Equitable's procedures do not vary significantly from the procedures in Lander. See Brief for Defendants-Appellees at 5 n.4, 6, Lander, 251 F.3d 101 (No. 00-7849), 2000 WL 33989283 (explaining that "[t]he assets invested in variable annuity contracts are segregated into 'separate accounts' and are typically invested in the owners' choice of one of a number of funds, which funds in turn invest in a portfolio of securities" and citing Prudential Ins. Co. of Am. v. SEC, 326 F.2d 383 (3d Cir. 1964) for the proposition that

7

"[s]eparate [a]ccounts that fund variable annuities are the issuers of those variable annuities for purposes of the Investment Company Act of 1940"). Based on the Lander facts, we conclude that Lander implicitly adopts the Third Circuit's holding in Prudential Insurance Co. of Am. v. SEC that it is the separate account funding the purchase of investments for an annuity that "issues" the annuity. See 326 F.2d at 388. Therefore, we are not persuaded by Ring's first proffered distinction.

However, the putative class members do differ from the Lander plaintiffs in one important respect: while putative Ring class members may have purchased covered securities in the form of variable life insurance policies, they also purchased a CTR, a classic insurance product. In contrast, the only and entire product at issue in Lander was a covered security. See 251 F.3d at 103, 109. Defendants argue that this distinction is not relevant because the CTR is by its terms incorporated into the policy of insurance, whether that policy is a term policy or a variable policy. Ring disagrees, arguing that we must disaggregate the CTR from the variable life insurance policy before determining whether it is a covered security.

As defendants urge, the CTR becomes a part of the policy contract, and the contract may take the form of a covered security. However, the CTR here at issue has the following properties: (a) it is optional; (b) it can be attached to a policy regardless of whether the underlying policy is a variable life policy (a covered security) or a whole life policy (not a covered security); (c) it entails a separate premium, a different risk (the child's life rather than the parent's), and a pay-out independent of other coverage; (d) it does not affect the investment function or performance of the underlying policy; and (e) the complaint does not plausibly allege that the CTR—or the fraud alleged in connection with it—induced the sale of the underlying

8

security as a security.  With these factors in mind, we now turn to the question of disaggregation.

Several years after deciding VALIC, the Supreme Court considered whether a hybrid insurance product—United Benefit Life Insurance's Flexible Fund—was subject to SEC registration requirements to the extent that it "dealt with [a] pre-maturity period" in which the insured bore the risk of investment losses.  SEC v. United Benefit Life Ins. Co., 387 U.S. 202, 206 (1967).  The Court of Appeals for the District of Columbia Circuit had held that the Flexible Fund contract must be considered in its entirety and that because the insured's risk ended at maturity when he or she could elect to either receive a fixed-income annuity or the cash value of his or her share of the fund, the Flexible Fund need not register.  See id. at 206-07.  The Supreme Court disagreed and held that an aggregation was not appropriate because the Flexible Fund contract made "[t]wo entirely distinct promises" whose "operation is separated at a fixed point in time."  Id. at 207.  The Court "conclude[d] that [it] must assess independently the operation of the 'Flexible Fund' contract during the [pre-maturity] period to determine whether that separable portion of the contract falls within the class of those exempted by Congress from the requirements of the Securities Act, and, if not, whether the contract constitutes a 'security.'"  Id. at 209.  It held that the Flexible Fund contract was a non-exempt security that must be registered. Id. at 210-11.

In Chemical Bank v. Arthur Andersen & Co., 726 F.2d 930, 932 (2d Cir. 1984), we considered whether a Section 10(b) claim could be made concerning "commercial bank loans evidenced by notes and, in one instance, secured by a pledge of a security."   Although we accepted that the agreements "were structured as, and were intended to be, part of one single, integrated refinancing package," id. at 933, we went on to address the notes and the security

9

pledge separately, holding that the notes were not securities, id. at 939, but that the pledge was, see id. at 940. Then, because plaintiffs did not allege that defendants made any misrepresentations concerning the security, we held that plaintiffs could not maintain a Section 10(b) lawsuit. Id. at 943, 945.

Thus, in determining whether a particular product is a security requiring registration as well as in determining whether a plaintiff may maintain a Rule 10(b) suit, we must disaggregate separate promises of a product or transaction.[3] The question remains whether SLUSA and the insurance product sold by Equitable require a different outcome. We hold that they do not.

As a preliminary matter, defendants' proposed factual distinctions are unavailing. Defendants argue that because the CTR is specifically incorporated in the policy, United Benefit and Chemical Bank are inapplicable. However, United Benefit also involved a single contract. See 387 U.S. at 205-06 (describing the Flexible Fund and the option to convert the policy into a fixed-payment annuity as being contained in the same contract). Further, in Chemical Bank, we assumed that the notes and the pledged security were all part of the same transaction. See 726 F.2d at 933. Therefore, the fact that only one contract or policy is at stake here does not require us to deviate from the principles established in United Benefit and

_____

[3] The Supreme Court has also disaggregated portions of a single financial product in other contexts. See Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen and Helpers of Am. v. Daniel, 439 U.S. 551, 559 (1979) ("In every decision of this Court recognizing the presence of a 'security' under the Securities Acts, the person found to have been an investor chose to give up a specific consideration in return for a separable financial interest with the characteristics of a security. In every case the purchaser gave up some tangible and definable consideration in return for an interest that had substantially the characteristics of a security.") (internal citations omitted); cf. John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank, 510 U.S. 86, 102 (1993) (applying the United Benefit approach—i.e. "divi[ding] the contract into its component parts and examin[ing the] risk allocation in each component"—in the ERISA context).

10

Chemical Bank.

Defendants also contend that the temporal aspect of United Benefit—that the variable product and the pure insurance product were in effect during different time periods—suffices to distinguish it. Of course this distinction does not apply to Chemical Bank, in which the securities and non-securities aspects of the transaction were simultaneous. 726 F.2d at 933. Further, although, unlike the product addressed in United Benefit, there is no fixed point in time at which the variable life insurance policy that some Ring class members purchased is no longer a variable product, the two products at issue—variable life and a CTR—do operate in a different chronological context. The variable life policy pays its benefits when the policyholder dies, but the CTR pays benefits when the insured child dies as long as the child dies before the age of twenty-five and within the life of the policy. Here there are two distinct promises to be discharged at different times, one involving a security and the other involving an insurance product. We believe these factors suffice to make United Benefit applicable.

Defendants dismiss United Benefit and Chemical Bank as "archival," but they do not explain why the reasoning of these cases should not govern a SLUSA analysis. Because the purpose of SLUSA is to preclude class action suits based on state law grounds but alleging fraud in the sale of "covered securities," we believe that it is entirely consistent with SLUSA to disaggregate in determining whether the plaintiff has alleged fraud in connection with a "covered security." Just as we would not allow the Section 10(b) suit in Chemical Bank to proceed because the fraudulent statements were not made in connection with the only portion of the integrated transaction involving a security, we should not preempt and dismiss a suit that alleges fraud occurred in connection only with a promise in a contract that does not relate to a "covered

11

security" even where another promise in the same contract does concern a "covered security."

The fact that the CTR can be appended to either a whole life policy or a variable life policy, does not change the character of the CTR depending on the product to which it is attached. The CTR standing alone is pure insurance, with the underwriting risks borne by the insurer and no residual value remaining at the end of the term. The CTR does not take on the qualities of the insurance or annuity with which it must be purchased simply because it cannot be sold alone.[4]

## CONCLUSION

We therefore vacate the district court's judgment and remand with instructions to remand to New York County Supreme Court.

---

[4] Defendants argue that Herndon v. Equitable Variable Life Ins. Co., 325 F.3d 1252, 1254 (11th Cir. 2003)—in which the Eleventh Circuit held that the distinction between "a variable annuity *with a life insurance component*" and the variable annuity considered in Lander was "inconsequential to an analysis of SLUSA's definition of 'covered security'"—requires us to hold to the contrary. They misread Herndon. Examination of the appellate briefs in Herndon makes it clear that the product at issue was a variable life insurance policy on a child's life and not, as here, a variable life insurance policy on a parent's life with a rider carrying no investment risk on a child's life. See Brief for Plaintiff-Appellant at 8, Herndon, 325 F.3d 1252 (No. 02-15358), 2002 WL 32118688 ("Appellant contends that Variable Life Insurance Policies are not categorically 'covered securities' within the purview of SLUSA."); Brief for Defendant-Appellee at 16, Herndon, 325 F.3d 1252 (No. 02-15358), 2002 WL 32118687 ("To the undersigned's knowledge, every federal court to consider the issue has held that a variable life insurance policy qualifies as a covered security under SLUSA."). Because Herndon does not involve two separate products that are the subject of two separate promises, it does not impact our conclusion that the CTR is a pure insurance product that is the subject of a separable promise and thus is not subject to SLUSA. Further, even if Herndon could be read as defendants suggest, it contains no analysis and is thus unpersuasive.